# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Anaya R.*, 2012 IL App (1st) 121101

---

| | |
|---|---|
| Appellate Court Caption | *In re* ANAYA R., a Minor (Mildred M., Petitioner-Appellant, v. Vanessa M.R., Respondent-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-1101 |
| Filed | August 31, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of a paternal grandmother's petition for visitation with her granddaughter was upheld where the evidence supported the trial court's finding that the grandmother did not rebut the presumption that the child was not harmed by the refusal of the child's mother to allow visitation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-P-3148; the Hon. John P. Callahan, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael K. Goldberg and Serena Nakano, both of Goldberg Law Group, LLC, of Chicago, for appellant.

Robert H. Purcell, of Chicago Volunteer Legal Services, of Palatine, for appellee.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.

Justices Garcia and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant case arises from petitioner Mildred M.'s appeal of the trial court's order denying her petition for visitation with her five-year-old granddaughter, Anaya R. (the child). Mildred is the paternal grandmother of the child, and Vanessa M.R. is the child's mother; the child's father Mauricio, Mildred's son, was deported to Ecuador in 2008. On appeal, Mildred claims that the trial court failed to properly consider the factors listed in section 607(a-5) of the Illinois Marriage and Dissolution of Marriage Act, commonly referred to as the grandparent visitation statute (750 ILCS 5/607(a-5) (West 2010)), and that she presented sufficient evidence to demonstrate that a denial of visitation would harm the child. We affirm.

¶ 2                                    BACKGROUND

¶ 3    On May 27, 2011, Mildred filed a petition for guardianship of the child, stating that she was "[t]he person having custody of the minor" and that it was in the child's best interest that a guardian be appointed because "Father is out of the country; Mother is unwilling to care for child." Consequently, Mildred asked that she be appointed guardian of the child's person. On the same day, Mildred's application to sue as an indigent person was granted, and an order for service on Vanessa by publication was entered since Mildred had listed Vanessa's address on the petition as "Unknown." On May 31, 2011, Mildred was appointed temporary guardian of the child.

¶ 4    On June 2, 2011, Judge Kathleen M. McGury issued an order finding: "Misrepresentations were made to Judge [Gregory] O'Brien[1] as an inducement for him to enter a Temporary Guardianship on 5/31/11." The order suspended the enforcement of the temporary guardianship order entered on May 31, ordered that the status quo be maintained until the next court date on July 11, 2011, and returned the child to Vanessa until the July 11

_____

[1]Judge O'Brien was the previous judge in the case.

court date. On the same day, the court appointed Chicago Volunteer Legal Services (CVLS) as guardian *ad litem* (GAL) of the child, asking it to conduct an investigation of the child's best interest and to make a recommendation to the court.

¶ 5   On July 12, 2011, Mildred filed a petition for visitation and amended petition for guardianship. In her petition, she stated that she was the paternal grandmother of the child and that she "took care of" Vanessa while she was pregnant, buying her food and taking her to doctors' appointments. She claimed that she had been a consistent part of the child's life since the child was born and provided the child with food, clothing, shelter, and medicine, "even sending these items home with the child to be used for the child's welfare when with [Vanessa]." Mildred further claimed that she scheduled "substantially all" of the child's doctors' appointments and took her to the majority of them; the child needed to visit a number of specialists for her "many medical issues," including a dermatologist, a respiratory therapist, and an endocrinologist.[2]

¶ 6   Mildred claimed that "the minor child's mother has only been in the child's life sporadically since birth and when the child was not with [Mildred] the minor child was taken care of by her great grandmother" and that "the minor child's mother has left the minor child in [Mildred's] care for weeks at a time with out [*sic*] so much as picking up the phone to check on her well being." Mildred also claimed that Vanessa once "looked to be on drugs" when she came to pick up the child and that Vanessa "admittedly drinks heavily."

¶ 7   Mildred also claimed that Vanessa practices the religion of Santeria and that, as a result of her religious practices, Vanessa had refused to give the child medicine on several occasions and had missed doctors' appointments; this refusal to give the child medicine once resulted in a severe urinary tract infection. Mildred further claimed that Vanessa smoked around the child despite the child's asthma and that Vanessa has smoked marijuana with the child present in the room. Mildred claimed that "the minor child was living with [Mildred] from June 2009 up to about 6 weeks ago with the mother visiting sporadically [and] sometimes no visits occurred for several weeks." Mildred also claimed that she had not been permitted to visit the child for six weeks for no reason, which was not in the child's best interest.

¶ 8   Mildred claimed that she had "fulfilled the child's needs as guardian for many years and would like to continue to do so as it is in the best interest of the minor child." Mildred also claimed that Vanessa had threatened her life when she filed for guardianship and that Vanessa had informed Mildred that she wished to kill her (Vanessa's) mother. Mildred further claimed that she had spent all Christmases and birthdays with the child and that she was with the child for her first day of school and other school events. Mildred requested temporary and permanent guardianship of the child, that she be granted reasonable visitation until guardianship is decided, including a Disney trip, and that Vanessa be ordered to undergo drug testing and a psychological evaluation.

¶ 9   On August 17, 2011, the GAL, Robert H. Purcell of CVLS, filed a report with the court.

---

[2]During the hearing on her petition for visitation, Mildred testified that the child had asthma and neurofibromatosis.

In the report, Purcell stated that his investigation included home visits and interviews with Mildred, Vanessa, the child, Vanessa's boyfriend, and Ana C., the child's maternal great-grandmother. The report noted that Mildred's claims that the child was living with Mildred from June 2009 until approximately June 1, 2011, and that since then, Vanessa had not permitted Mildred to visit the child were "critically important because the Court *** has jurisdiction to make a child custody determination when the proceeding is commenced by a person other than a parent, *but only if the minor is not in the physical custody of one of his parents*" (emphasis in original), citing section 601 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/601 (West 2010)).

¶ 10    Based on his investigation, Purcell found that Vanessa "jealously guarded her authority to decide who would care for her daughter," and her actions demonstrated that she did not transfer or abandon that authority. Purcell further found that Vanessa "received substantial help with child care, but stayed in control of the process." Additionally, Purcell noted that there was a factual inconsistency between Mildred claiming she had physical custody of the child and asking for visitation because she was not permitted to visit the child. The GAL recommended that the petition for guardianship be denied for want of jurisdiction because Vanessa had physical custody of the child.

¶ 11    In regard to the request for visitation, the GAL stated that Vanessa was worried that Mildred would take action to harm the relationship between Vanessa and the child and worried that Mildred would attempt to take the child from Vanessa's care. The GAL noted that Vanessa recognized that Mildred had been an important part of the child's life and would be in favor of supervised visitation. The GAL found that many of Vanessa's concerns were reasonable and "encourage[d] [Mildred] to seek ways to constructively address them." The GAL recommended that the question of visitation be set for mediation.

¶ 12    On August 17, 2011, the court entered an order withdrawing the petition for guardianship, ordering visitation that was to be supervised by Ana C., and continuing the matter. On the same day, the court entered an order stating that "all parties shall participate in mediation through the Center for Conflict Resolution. Failure to cooperate with the mediation process may lead to dismissal of petition or a finding against the non-cooperating party." The record contains a fax from the Center for Conflict Resolution to the court that stated: "Initiator [Vanessa] did not show up to mediation. Respondent [Mildred] was present at mediation."

¶ 13    On October 3, 2011, Mildred filed a petition for rule to show cause, claiming that Vanessa did not attend mediation and was often late for the supervised visits ordered by the court. Mildred requested an expanded visitation schedule that was no longer supervised and asked for Vanessa to be admonished by the court. On October 18, 2011, the court entered an order stating that the child should receive counseling "as soon as possible," ordering "[n]o visitation at this time," and continuing the matter until November 22, 2011. On November 22, 2011, the court ordered the child to continue in counseling, repeated that there was no visitation, and set the matter for hearing on January 18, 2012.

¶ 14    On the same day, the GAL filed a supplemental report with the court. In reciting the history of the case, the supplemental report noted that "[t]he Mother failed to attend the

Mediation appointment. The Mother apologized and explained to the Court her failure to do so." The supplemental report stated that the GAL requested The Chicago School Forensic Center (the Center) to conduct a psychological evaluation of the child "for stress related to the visitations with the paternal grandmother and the conflict between her mother and her paternal grandmother" and also requested the counselor's professional judgment about any need for ongoing counseling.

¶ 15    The report stated that Vanessa acknowledged that Mildred "has been an important part of [the child's] life," but that Vanessa was no longer willing to permit visitation because Mildred " 'over-steps her boundaries[,]' " "undermines the child's relationship" with Vanessa and "tries to take [the child] away" from Vanessa. The report then contained six statements that appear to provide examples of Vanessa's concerns. The first stated that the original petition for guardianship was filed without notice to Vanessa and stated that Vanessa's whereabouts were unknown, which was not true. The second stated that the original petition for guardianship stated that Vanessa was not willing to care for the child, which was not true. The third stated that Mildred made two reports to the Department of Children and Family Services (DCFS), which DCFS determined to be unfounded. The fourth stated that Vanessa "has felt the need to obtain the help of the police to pick up" the child from Mildred. The fifth stated that Vanessa believed that Mildred would tell the child things that were untrue and would be confusing to her, which would undermine the child's relationship with Vanessa. The sixth stated that Vanessa "feels [Mildred] is domineering and controlling. [Vanessa] feels dealing with [Mildred] will continue to cause a great deal of stress that is harmful." The GAL found that Vanessa's concerns were reasonable and, accordingly, Vanessa's denial of visitation was not unreasonable. Therefore, the GAL recommended that the petition for visitation be denied.

¶ 16    On January 18, 2012, the GAL filed a second supplemental report, which stated that the therapist who examined the child "did not reach a Judgment that visitations with her paternal grandmother would be helpful or harmful to the [child], nor would the lack of visitation be helpful or harmful." The report further stated that the Center recommended ongoing therapy for the child, and attached the report issued by the Center. The one-page report from the Center was signed by Kathleen Menges, "Therapist," and Laurie Benton, PsyD, "Supervisor." It stated that the child and Vanessa had attended therapy sessions beginning on November 15, 2011, and that they had attended all scheduled sessions. The report concluded, "At this time, it is recommended that [they] continue."

¶ 17    On January 18, 2012, the court held a hearing concerning Mildred's petition for visitation.[3] Twelve witnesses testified on Mildred's behalf and two testified on Vanessa's behalf. The first witness to testify on Mildred's behalf was Catherine Evans, an employee of the Guardianship Assistance Desk for Minors in Cook County, who testified that she assisted Mildred with filing her petition for guardianship, that Mildred was unaware of the whereabouts of Vanessa, and that Mildred had listed Vanessa's address as unknown on the

---

[3]The record does not contain a transcript of the hearing but contains a bystander's report certified as accurate by the trial court on June 7, 2012.

petition.

¶ 18    The next witness to testify on Mildred's behalf was Gladys B.,[4] who testified that she was a teacher at Casa Central daycare, which the child attended. Gladys testified that in order to enroll the child in daycare, Gladys was required to visit the child at her home address. Gladys testified that the address on file at the daycare center was Mildred's address and that she visited the child at that address on three occasions; Vanessa was present for two of the visits. Gladys testified that both Vanessa and Mildred dropped off and picked up the child from daycare, but that "most of the time," Mildred did so. Gladys further testified that Mildred accompanied the child on field trips, attended parent meetings, and was the only person present on the child's behalf at the child's graduation from daycare.

¶ 19    Five of Mildred's friends also testified on her behalf. Leidy A.[5] testified that she had a child who attended the daycare with Vanessa's child and that the two children were friends. Leidy further testified that she observed Mildred picking up the child from daycare every day and that she and Mildred would make plans for the children to spend time together, including going to the movies, McDonald's, and Chuck E. Cheese. Leidy also testified that the children would often have "sleepovers" at Mildred's home.

¶ 20    Josefa V. testified that she observed Mildred with the child "a lot" and that Mildred would usually bring the child when she visited Josefa. Josefa also testified that when Mildred visited Josefa with the child, the child would watch television and draw.

¶ 21    Elizabeth C. testified that the child was always present at Mildred's home when Elizabeth visited and that the child had her own bedroom in Mildred's home. Elizabeth also testified that sometimes Mildred and the child would come to Elizabeth's home and the child would play with Elizabeth's children.

¶ 22    Brenda T. testified that she had known Mildred for more than five years and that she observed Mildred visiting with the child on many occasions. Brenda further testified that when she visited Mildred's home, the child was present and that Mildred and the child would attend birthday parties for Brenda's children.

¶ 23    Maggie H. testified that she knew Mildred "through business" and that she observed the child many times with Mildred when Mildred visited Maggie's home or when Maggie visited Mildred's home.

¶ 24    All of Mildred's friends opined that the child was happy and safe with Mildred.

¶ 25    Ms. C., Vanessa's mother, also testified on Mildred's behalf.[6] Ms. C. testified that Mildred has been supporting the child and taking care of the child for the child's entire life and that Mildred was "very involved" in the child's life. Ms. C. testified that she had a "weird" relationship with Vanessa and that Vanessa had threatened her. Ms. C. opined that Mildred deserved to be awarded visitation.

---

[4]Gladys testified in Spanish and her testimony was translated through an interpreter.

[5]Leidy testified in Spanish and her testimony was translated through an interpreter.

[6]The record does not indicate Ms. C.'s first name.

¶ 26    Additionally, several members of Mildred's family testified on Mildred's behalf. Maria C., Mildred's daughter, testified that Mildred was a good mother to Maria and that Mildred was "always there" for the child, that the child stayed with Mildred, and that Mildred "always took care of" the child. Maria testified that she knows Vanessa and has known Vanessa since she was 14 years old. Maria testified that she witnessed Vanessa drink and smoke while she was pregnant with the child and that after the child was born, she witnessed Vanessa "drink, smoke, and consume drugs in the presence of" the child. Maria opined that the child was happy when with Mildred, that Mildred "gave the *** child a lot of love," and that the child was safe when with Mildred.

¶ 27    Jennifer M., Mildred's niece, testified that she had observed the child at family reunions and when she had visited her mother's home or Mildred's home. Jennifer testified that since the child was born, she had always observed the child with Mildred. Jennifer further testified that she had observed Mildred with the child at the swimming pool and that the child and Jennifer's son played together. Jennifer opined that the child was happy and safe with Mildred.

¶ 28    Ricardo B., Mildred's fiancé, testified[7] that he has known Mildred for 12 to 13 years and that Mildred and the child are present at his home five to six days a week. Ricardo further testified that when Mildred was in Ecuador, he would babysit for the child six to seven times while Mildred was gone.

¶ 29    The first witness to testify on Vanessa's behalf was Ana C., the child's maternal great-grandmother.[8] Ana testified that the court-ordered supervised visits between Mildred and the child had taken place in her apartment. She further testified that the visits "did not go well and were not a good thing." She testified that Mildred "was more interested in finding fault than spending time enjoying her granddaughter" and opined that Mildred should not be granted visitation because she was "overbearing" and visits "would result in conflict."

¶ 30    Ana testified to one specific incident in which Mildred came to Ana's home early in the day without notice and "banged" on the door, demanding that Ana and her husband open the door. Mildred then banged on the windows and on the back door. Ana and her husband, who is elderly and blind, did not open the door "because they were afraid."

¶ 31    Vanessa also testified on her own behalf. Vanessa testified that the child has always lived with her but that "she did have help" from Ana C. and Mildred in caring for the child. Vanessa testified that she was no longer willing to permit Mildred to visit the child "because she over-steps her boundaries." Vanessa testified that Mildred "tries to take her child away from her" and that Vanessa "is afraid of losing her daughter." Vanessa further testified that Mildred undermined Vanessa's relationship with the child and said things to the child that

_____

[7]Ricardo testified in Spanish and his testimony was translated through an interpreter.

[8]Ana testified in Spanish and her testimony was translated through an interpreter.

were not true.[9] Vanessa also testified that Mildred took the child to New York without permission.

¶ 32    Vanessa also testified that Mildred took the child to the doctor without Vanessa's permission. During her testimony, Vanessa was shown two forms authorizing Mildred to take the child to the doctor, and Vanessa responded that she "wrote those authorizations because [Mildred] was taking the [child] to New York." Vanessa testified that she was afraid that Mildred would take the child to Ecuador and "did not know all the rules about passports."

¶ 33    Vanessa testified that she was unaware that a petition for guardianship had been filed until she attempted to pick up the child from Mildred's home and Mildred refused, showing Vanessa a court order granting Mildred temporary guardianship of the child. The next day, Vanessa went to court and the order was suspended. Vanessa testified that she picked up the child from Mildred's home "with the help of the police."

¶ 34    The final witness to testify was Mildred, who testified on her own behalf. Mildred testified that she has known Vanessa for approximately seven years, since Vanessa began dating Mildred's son. Mildred testified that during Vanessa's pregnancy, she took care of Vanessa by buying her food and taking her to doctors' appointments. Mildred testified that "she loved [Vanessa] like a daughter." Mildred testified that she has always been involved in the child's life and has provided the child with whatever she needed. Mildred testified that for approximately two years, the child resided more with Mildred than with Vanessa, and Vanessa came to visit the child.

¶ 35    Mildred testified that she filed the petition for guardianship of the child because she was afraid for the child's well-being. She testified that on or about March 16, 2011, she traveled to Ecuador and, before leaving, she had taken the child to be examined by a medical doctor because the child was having difficulty using the bathroom. The child's doctor diagnosed the child as having a urinary tract infection and prescribed an antibiotic medication. However, Vanessa never gave the child the antibiotic. Mildred testified that Vanessa had stated that the child was sick because Vanessa's coworker had "done a ritual cure" on Vanessa, which transferred the illness to the child. Mildred testified that Vanessa informed her that she performed a cleansing ritual on her and the child and that the child would be "better off" without the antibiotic.

¶ 36    Mildred testified that when she returned from Ecuador on April 22, 2011, the child "appeared to be okay." However, on May 20, 2011, Mildred took the child to the emergency room, where the child was diagnosed with "a very bad urinary tract infection."

¶ 37    Mildred testified that when she completed the petition for guardianship, she listed Vanessa's address as unknown "because she was not aware of [Vanessa's] exact address, and only knew how to get there." Mildred testified that when the petition was completed, she

_____

[9]The bystander's report does not explain what Vanessa claims Mildred said. However, in the first GAL report, Vanessa told the GAL that Mildred told the child to call Vanessa "Mommy Vanessa" and Mildred "mommy." She also told the GAL that Mildred told the child that Vanessa believed the child was " 'Basura Y fea' which in English means trash and ugly."

located Vanessa's address and telephone number and attached them to the petition. Mildred also testified that on the day she filed the petition, she called Vanessa to inform her of the filing and that Vanessa threatened Mildred; Mildred testified that, in the past, Vanessa had threatened Mildred by telling her that Vanessa had friends who were gang members and could hurt Mildred.

¶ 38 Mildred testified that the police "were involved" once when Vanessa called the police. On that occasion, Mildred was with the child at the zoo and Vanessa called Mildred and told her that she wanted to see the child. Mildred informed Vanessa that she could see the child when they left the zoo or could come to the zoo to pick up the child. When Mildred and the child left the zoo, it was late, and they were tired, so she told Vanessa to pick up the child at Mildred's home. Vanessa threatened to call the police, and Mildred told Vanessa it was not necessary to call the police and that Vanessa could come to pick up the child. Vanessa arrived at Mildred's home with the police.

¶ 39 Mildred testified that she took the child to the child's primary care doctor, as well as to specialists. Mildred testified that the child had neurofibromatosis, which required Mildred to take the child to specialists including an endocrinologist, dermatologist, and ophthalmologist. Mildred further testified that the child has asthma and that Mildred took the child to a "pulmonary doctor" for over two years, in addition to the child's regular appointments with the primary care doctor.

¶ 40 Mildred denied taking the child to New York without permission and testified that she had traveled with the child on over 20 occasions with Vanessa's permission, including trips to Wisconsin Dells, Florida, and New York. Mildred testified that Vanessa was aware when she was traveling with the child. Mildred further testified that Vanessa had signed authorization forms in 2009 and 2010 and that Vanessa was "lying" about the forms being signed when Mildred took the child to see the child's father in New York, because the father had been deported in 2008.

¶ 41 After all of the witnesses had testified, the GAL gave a closing argument in which he argued that Mildred should not be awarded visitation because Mildred had "bad intentions" when filing the initial petition for guardianship of the child and noted that Mildred was a "very passionate person." The GAL argued that a "core issue" in the case was whether Vanessa's denial of visitation was reasonable or unreasonable, and that the denial "was both reasonable and understandable." The GAL argued that Vanessa was reasonably worried that visitation would result in the loss of the child and that Mildred's knowledge of the " 'system' " would enable Mildred to "take the baby." The GAL argued that Vanessa was worried that Mildred's "criticism and disapproval" would result in more unfounded reports to DCFS or another authority.

¶ 42 The GAL also argued that Vanessa was concerned that Mildred would say untrue things about Vanessa and that Vanessa's mistakes would be exaggerated to enable Mildred to "take over." The GAL argued that Vanessa was concerned that Mildred would harm Vanessa's relationship with the child and would undermine the child's relationship with Vanessa by saying untrue and confusing things to the child.

¶ 43 The GAL argued that Vanessa felt that Mildred was "domineering and controlling" and

had felt the need to obtain the help of police in order to pick up the child from Mildred's home. The GAL also argued that Vanessa felt that "dealing with [Mildred] will continue to cause a great deal of stress that is harmful" to Vanessa and the child, which is why Vanessa stopped the visitations.

¶ 44    The GAL also argued that Mildred acted in bad faith by filing the petition for guardianship without notice to Vanessa and stating that Vanessa's whereabouts were " 'unknown,' " which was not true. The GAL also argued that the original petition for guardianship stated that Vanessa was unwilling to care for the child, which was untrue; the GAL noted that Mildred had made two reports to DCFS, both of which were determined to be unfounded. The GAL claimed that Mildred "wanted to take the child from [Vanessa]."

¶ 45    Finally, the GAL argued that Mildred had the burden of proof, which she did not meet, and that the petition for visitation should be denied.

¶ 46    After a brief recess, the court denied Mildred's petition for visitation, finding that Mildred had not met her burden of demonstrating that Vanessa's decision to terminate visitation was harmful to the child's mental, physical, or emotional health. The court noted that Mildred "was her own worst enemy," and stated that it had observed through Mildred's court appearances that she was "domineering and overbearing." The court found that Mildred had helped with the child and had been involved with the child, but found that insufficient to award visitation to Mildred. The court also took issue with the fact that Mildred had provided her own translator for one witness, stating that Mildred "was attempting to manage his courtroom." The court found that Mildred "would create conflict" between the child and Vanessa and that Vanessa "had reason to be concerned" that Mildred would "purposely turn the *** child against her." The court found that Vanessa was capable of making decisions concerning the child and the court stated that it would not grant visitation and that the decision to permit or deny visitation "would remain solely the personal decision" of Vanessa. The court stated that it "highly recommended" that the parties come to an agreement and stated that it "strongly believed [Mildred] would interfere with parental decision making authority."

¶ 47    On February 14, 2012, Mildred filed a motion to reconsider the court's denial of her petition. The motion stated that the child's father, Mauricio, was deported to Ecuador in or about October 2008 and that on or about August 20, 2008, Vanessa and Mauricio executed an "Illinois Voluntary Acknowledgment of Paternity."[10] Mildred claimed that the court had failed to properly consider the factors of the grandparent visitation statute in denying her petition for visitation. On March 13, 2012, Mildred's motion to reconsider was denied after the court stated that it had considered each of the factors in the grandparent visitation statute and Mildred had failed to meet her burden of proof. Mildred timely appealed.

¶ 48                                            ANALYSIS

¶ 49    On appeal, Mildred claims that the trial court erred in denying her petition for visitation

---

[10]The "Voluntary Acknowledgment of Paternity" is not included in the record on appeal.

because she sufficiently demonstrated that a denial of visitation would harm the child. Under the grandparent visitation statute, a grandparent is permitted to file a petition for visitation "if there is an unreasonable denial of visitation by a parent" and at least one of a number of conditions exists.[11] 750 ILCS 5/607(a-5)(1) (West 2010). In determining whether to grant such a petition, the statute provides that "there is a rebuttable presumption that a fit parent's actions and decisions regarding grandparent, great-grandparent, or sibling visitation are not harmful to the child's mental, physical, or emotional health. The burden is on the party filing a petition under this Section to prove that the parent's actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health." 750 ILCS 5/607(a-5)(3) (West 2010). This presumption "is the embodiment of the fundamental right of parents to make decisions concerning the care, custody, and control of their children which is protected by the fourteenth amendment." *Flynn v. Henkel*, 227 Ill. 2d 176, 181 (2007).

¶ 50    According to our supreme court, "[a] trial court's determination that a fit parent's decision regarding whether grandparent visitation is or is not harmful to the child's mental, physical, or emotional health will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Flynn*, 227 Ill. 2d at 181. The reason for this deferential standard is that "the trial court is in a superior position to assess the credibility of witnesses and weigh the evidence" than we are. *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007); *In re D.W.*, 386 Ill. App. 3d 124, 136 (2008) ("the trial court, having observed the witnesses and heard their testimony, is in the best position to make credibility determinations"). As a result, we will find that a trial court's decision is against the manifest weight of the evidence only "where a review of the record clearly demonstrates that the result opposite to [the one] reached by the trial court was the proper result." *In re Stephen K.*, 373 Ill. App. 3d at 25; *In re D. W.*, 386 Ill. App. 3d at 139 (a finding is against the manifest weight of the evidence if it is unreasonable, arbitrary, and not based on the evidence).

¶ 51    In the case at bar, Mildred argues that she presented sufficient evidence to rebut the statutory presumption and that the trial court's decision to the contrary was against the manifest weight of the evidence. We do not find Mildred's argument persuasive. In addition to providing a presumption in favor of a parent's decision concerning visitation, the statute gives guidance to a trial court in determining whether to grant a petition for visitation, providing:

> "In determining whether to grant visitation, the court shall consider the following:
>
> (A) the preference of the child if the child is determined to be of sufficient maturity to express a preference;
>
> (B) the mental and physical health of the child;
>
> (C) the mental and physical health of the grandparent, great-grandparent, or sibling;

---

[11]In the case at bar, section 607(a-5)(1)(E) applies, since "the child is born out of wedlock, the parents are not living together, the petitioner is a paternal grandparent, great-grandparent, or sibling, and the paternity has been established by a court of competent jurisdiction." 750 ILCS 5/607(a-5)(1)(E) (West 2010).

(D) the length and quality of the prior relationship between the child and the grandparent, great-grandparent, or sibling;

(E) the good faith of the party in filing the petition;

(F) the good faith of the person denying visitation;

(G) the quantity of the visitation time requested and the potential adverse impact that visitation would have on the child's customary activities;

(H) whether the child resided with the petitioner for at least 6 consecutive months with or without the current custodian present;

(I) whether the petitioner had frequent or regular contact or visitation with the child for at least 12 consecutive months;

(J) any other fact that establishes that the loss of the relationship between the petitioner and the child is likely to harm the child's mental, physical, or emotional health; and

(K) whether the grandparent, great-grandparent, or sibling was a primary caregiver of the child for a period of not less than 6 consecutive months." 750 ILCS 5/607(a-5)(4) (West 2010).

In the case at bar, Mildred argues that based on these factors, the trial court erred in denying her petition for visitation because she had met her burden to rebut the presumption.

¶ 52    Mildred focuses on several of the factors that she claims weigh in her favor, arguing that she has a close relationship with the child and that the child was happy and safe when with Mildred. She further claims that she was actively involved in the child's life, taking the child to doctors' appointments, attending parent meetings at school, arranging playdates, and traveling with the child, and also argues that Vanessa's denial of visitation was in retaliation for Mildred's filing of a petition for guardianship and demonstrates Vanessa's bad faith. The GAL, on the other hand, acknowledges that Mildred has a "long and quality relationship" with the child, but focuses on Mildred's "overbearing" personality and instances in which she interfered with the relationship between Vanessa and the child. The GAL also argues that Mildred's conduct in filing her initial petition for guardianship, which resulted in the trial court finding that Mildred had made misrepresentations in seeking guardianship, her conduct in filing DCFS reports that were unfounded, and her conduct in filing as an indigent person all demonstrate Mildred's bad faith.

¶ 53    In its denial of Mildred's petition, the court clearly placed the most weight on Mildred's behavior and relationship with Vanessa, finding that Mildred "would create conflict" between the child and Vanessa and that Vanessa "had reason to be concerned" that Mildred would "purposely turn the *** child against her." Accordingly, the trial court found that Mildred had not met her burden to demonstrate that the child would be harmed by Vanessa's decision to deny visitation. We cannot find this decision to be against the manifest weight of the evidence because there is ample evidence in the record supporting the trial court's decision to deny visitation. For instance, Mildred initially petitioned for guardianship of the child in a way that led the court to find that "Misrepresentations were made to Judge O'Brien as an inducement for him to enter a Temporary Guardianship on 5/31/11." Evidence was also

-12-

presented that Mildred told the child things that were untrue or confusing to the child, and attempted to interfere in Vanessa's relationship with the child. Finally, the trial court had the opportunity to observe Mildred throughout the proceedings and found that she was "domineering and overbearing." As noted, "the trial court is in a superior position to assess the credibility of witnesses and weigh the evidence." *In re Stephen K.*, 373 Ill. App. 3d at 25. Since there is evidence that supports the trial court's decision to deny the petition for visitation, we cannot say that "a review of the record clearly demonstrates that the result opposite to [the one] reached by the trial court was the proper result" (*In re Stephen K.*, 373 Ill. App. 3d at 25), and thus we cannot find that the trial court's decision was against the manifest weight of the evidence.

¶ 54    We find support for our conclusion in the Illinois Supreme Court case of *Flynn*, which is the sole Illinois case discussing the statutory presumption and its definition of "harm." In that case, the paternal grandmother of a child learned of the child's birth one month after he was born and visited the child that night. The child's mother permitted the grandmother to visit the child, as long as she and her husband did not permit the child's father to accompany them on visits with the child; the father had recently been released from prison and the child's mother refused to allow him to visit the child. When the father petitioned the court for visitation with his son, the mother became angry with the grandmother and refused to allow her visitation rights with the child. Eventually, the father was granted supervised visitation at a behavioral health-care center, and the grandmother was able to visit the child at the same time. The supervised visitation was later moved to the mother's house, but the grandmother did not attend visitation there. After the father left the state, the grandmother petitioned for visitation, which was permitted. At the time of the hearing on the petition for visitation, the child was almost three years old. In permitting the grant of visitation, the trial court stated:

  " 'Okay. Based on the testimony presented the Court finds that the petitioner has met her burden. The harm in this case is not something that you can put in the sense of a direct emotional harm. It's a direct denial of an opportunity that every grandparent according to this statute is entitled to.' " *Flynn*, 227 Ill. 2d at 179.

The trial court then addressed the factors listed in the statute and decided in favor of visitation, but did not make any specific findings concerning how the grandmother had overcome the presumption. *Flynn*, 227 Ill. 2d at 179. The appellate court affirmed the trial court's decision, rejecting the mother's argument that the grandmother had failed to prove that the child would be harmed if visitation was denied. The appellate court stated:

  " 'The harm that [the child] would suffer if there were no visitation can be inferred from the evidence. As the trial court stated, it "is not something that you can put in the sense of a direct emotional harm." However, [the grandmother's] love for [the child] is manifest in the record. She tried to become involved with [the mother] even before [the child] was born and sent items for the baby. She came to visit [the child] the very night that she learned that he had been born. As [the grandmother] said, "I just want to be part of [the child's] life. He deserves it and I deserve it." *If [the grandmother] were denied visitation, [the child] would be harmed by never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother.* There was no

evidence that the prior visitation interfered with [the mother's] relationship with [the child], and the evidence showed that [the grandmother] would abide by any restrictions that the court placed on future visitation. We can find no error in the trial court's finding that [the mother's] denial of visitation was harmful to [the child's] mental, physical, or emotional health ***.' " (Emphasis in original.) *Flynn*, 227 Ill. 2d at 180 (quoting *Flynn v. Henkel*, 369 Ill. App. 3d 328, 335 (2006)).

¶ 55    On appeal, the supreme court reversed the grant of visitation. The supreme court found that "[a]lthough [the grandmother] testified that [the child] loves her and that he hugs her and holds her when he sees her, she did not present any evidence to show that denial of visitation with her would result in harm to [the child's] mental, physical, or emotional health. The only evidence pertaining to harm [the child] would experience from the denial of visitation with his grandmother came from [the mother], who was asked, 'Do you believe it would be harmful for [the child] not to see [the grandmother] and visit with her?' and she answered 'No.' " *Flynn*, 227 Ill. 2d at 184. The supreme court further noted:

"It is clear that the trial court, in its oral pronouncement at the conclusion of the April 21 hearing and contrary to the appellate court's interpretation of that pronouncement, found there was no 'direct emotional harm' to [the child] in [the mother's] decision to deny visitation to [the grandmother]. Rather, the trial court clearly stated that the harm is 'a direct denial of an opportunity that every grandparent according to this statute is entitled to.' Neither denial of an opportunity for grandparent visitation, as the trial court found, nor a child 'never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother,' as the appellate court held, is 'harm' that will rebut the presumption stated in section 607(a-5)(3) that a fit parent's denial of a grandparent's visitation is not harmful to the child's mental, physical, or emotional health." *Flynn*, 227 Ill. 2d at 184.

Accordingly, the supreme court found the trial court's "unsupported oral pronouncement that petitioner had met her burden of proof in overcoming the statutory presumption that [the mother's] decisions denying grandparent visitation was not harmful to [the child's] mental, physical or emotional health" was against the manifest weight of the evidence. *Flynn*, 227 Ill. 2d at 185.

¶ 56    In the case at bar, Mildred distinguishes her situation from that present in *Flynn*, arguing that she "was significantly more involved" in the child's life than the grandmother in *Flynn*. Mildred further argues that "besides the overwhelming evidence of the close and substantial relationship between the minor child and her Grandmother, the evidence of harm and/or a likelihood of harm was that Mother admitted that Grandmother was important to the minor child, Mother admitted that she was denying grandparent visitation, that the minor child was happy when she was with Grandmother, and that after the denial of grandparent visitation, the minor child had a psychological evaluation that resulted in a recommendation that the minor child continue in therapy sessions." We do not find Mildred's argument persuasive.

¶ 57    While Mildred presented evidence that she was heavily involved in the child's life, she did not present evidence that the effect of denying visitation would be any different than the type of "harm" rejected in *Flynn*. We also note that the record indicates that the relationship

between Mildred and Vanessa is extremely contentious and that the trial court "strongly believed [Mildred] would interfere with parental decision making authority," whereas in *Flynn*, the grandmother " 'did not undermine the child's relationship with his mother.' " (Emphasis omitted.) *Flynn*, 227 Ill. 2d at 180 (quoting *Flynn*, 369 Ill. App. 3d at 335). Thus, even if here, Mildred is more involved than the grandmother in *Flynn*, the negative aspects of the relationship are also greater, and we cannot find that Mildred's involvement in the child's life alone is sufficient to demonstrate that the trial court's decision was against the manifest weight of the evidence.

¶ 58     Finally, we do not find the cases that Mildred cites from other jurisdictions to be persuasive. As noted, the Illinois Supreme Court has spoken on the issue in *Flynn*, and we find this case analogous to that one. Moreover, the cases cited to are not helpful to Mildred, as they impose a high standard in order to find that a parent's decision concerning visitation has harmed the child. See, *e.g.*, *Roth v. Weston*, 789 A.2d 431, 450 (Conn. 2002) (requiring that a petitioner "has a relationship with the child that is similar in nature to a parent-child relationship" and that denial of visitation will result in a degree of harm analogous to the child being " 'neglected, uncared-for or dependent' "). While Mildred claims that she has met this high standard by showing that she has essentially acted as a parent to the child, there is evidence in the record disputing her claim, and further evidence that Mildred has interfered with the child's relationship with her mother by attempting to poison the child's mind. As a result, the trial court's decision to deny the grandmother's petition is not against the manifest weight of the evidence.

¶ 59                                  CONCLUSION

¶ 60     Evidence was presented supporting the trial court's determination that Mildred failed to rebut the presumption that Vanessa's denial of visitation was not harmful to the child. Accordingly, the trial court's decision to deny Mildred's petition for visitation was not against the manifest weight of the evidence.

¶ 61     Affirmed.

-15-