**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190734-U

Order filed November 6, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| PRZEMYSLAW W., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Petitioner and Third-Party | ) | Will County, Illinois. |
| Respondent-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-19-0734 |
| NICOLE ANTIONETTE A., | ) | Circuit No. 16-F-1482 |
| | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |
| (Darlene B., | ) | Honorable |
| | ) | Victoria R. Breslan, |
| Third-Party Petitioner-Appellee). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justice Holdridge concurred in the judgment.
Justice Schmidt dissented.

_____

**ORDER**

¶ 1     Held:    Trial court's decision denying father's petition to terminate grandparent visitation between his minor daughter and her maternal grandmother was not against the manifest weight of the evidence.

¶ 2    Petitioner Przemyslaw W. (Shem), is the biological father and single parent of I.W. (born August 24, 2014). Respondent Nicole Antionette A. (Nicole), I.W.'s mother, passed away when I.W. was two years old. Litigation between Shem and Nicole's mother, third-party petitioner Darlene B. (Darlene), resulted in an agreed order allowing grandparent visitation one day a week and the third Saturday of every month. After a year of strained relations, Darlene filed a petition to modify the visitation order. In response, Shem filed a motion to terminate grandparent visitation under section 602.9(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.9(d) (West 2018)). The circuit court denied Shem's motion and granted Darlene's motion in part, entering an order modifying Darlene's visitation to one day each month and revising the parties' transportation responsibilities. Shem appeals, claiming that the trial court's denial of his motion to terminate was against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Shem and Nicole lived together between May 2014 and November 2016 and planned to marry in 2017. Their daughter, I.W., was born in August 2014. In October 2015, Nicole experienced a recurrence of breast cancer. She received treatment, but her condition worsened, and in September 2016, she was hospitalized. On November 17, she was discharged and placed in hospice care at Darlene's home. A few days later, Shem took I.W. to Darlene's house to stay with Nicole.

¶ 5    On November 21, 2016, prior to Nicole's death, Darlene's husband sought and obtained an *ex parte* emergency order of protection against Shem. The emergency order listed I.W. as a protected party. Nicole passed away eight days later. After Nicole's passing, Darlene retained custody of I.W. and declined the opportunity to return the child to Shem. In response, Shem filed

2

a petition for adjudication of parentage and hearing *instanter*. Thereafter, Darlene filed a petition for guardianship of I.W.

¶ 6 On December 12, 2016, the trial court denied an extension of the emergency order of protection against Shem. Pursuant to the court's order, Darlene returned I.W. to Shem on December 18, 2016. Two days later, a judgment of paternity was entered, establishing Shem as the father of I.W. and awarding him custody.

¶ 7 In addition to the paternity judgment, the court entered an agreed order providing Darlene visitation with I.W. The agreed order provided that as long as Shem continued his employment in Bolingbrook, Illinois, Darlene would have visitation with the child every Tuesday and Wednesday from 5:45 a.m. to 2:45 p.m. Further, every third Saturday of the month, Darlene would have visitation with the child from 11 a.m. until 5 p.m. regardless of the location of Shem's employment. Darlene was responsible for transportation of the child to and from visitation. She was also responsible for documenting the child's routine and schedule in a planner. The parties agreed that the order was modifiable "upon a substantial change in circumstances, including, but not limited, to the following: [I.W.'s] school schedule, [Shem's] home or work location; or [Shem's] work schedule." In consideration of the agreement, Darlene and her husband dismissed their petition for guardianship. The court entered the agreed order on January 25, 2017.

¶ 8 Shortly thereafter, Shem moved to Ingleside, Illinois. Both parties agree that, following his move, the drive between Shem's house and Darlene's house is approximately an hour and forty minutes each way.

¶ 9 In February 2018, Darlene filed a petition to modify visitation, which she later amended. The amended motion requested the following: (1) visitation every other weekend from Friday after I.W.'s childcare or school through Sunday evening; (2) visitation for two nonconsecutive weeks

3

during summer break; (3) right of first refusal if Shem left the child overnight; (4) information regarding I.W.'s school schedule and extra-curricular activities; (5) reasonable daily communication with I.W.; and (6) listing Darlene as an emergency contact with childcare and I.W.'s school.

¶ 10    Shem responded by filing a motion to terminate visitation. In his motion, Shem cited section 602.9(d) of the Act, stating that in the event of a change in circumstance a parent may petition for modification, or termination, when "in the best interests of the child." See 750 ILCS 5/602.9(d)(2). The motion also stated that there was a presumption that a fit parent's actions are in the best interests of the minor, citing *Troxel v. Granville*, 530 U.S. 57, 68 (2000), and *Flynn v. Henkel*, 227 Ill. 2d 176, 181 (2007). In the alternative, the motion requested that the court reduce Darlene's visitation to monthly "Skype" sessions or telephone calls. In support of his termination request, Shem alleged that Darlene defied his instructions with respect to I.W. and endangered the child's wellbeing. Specifically, he claimed that Darlene fed I.W. fast food, allowed her to swim in a pool even though she does not know how to swim, returned the child in inappropriate clothing for the weather conditions, and failed to provide documentation of I.W.'s schedule and routines. Shem also alleged that on more than one occasion I.W. fell ill after visitation with Darlene and returned with multiple injuries. He wished for visitation to occur "organically" between I.W. and Darlene and stated that a court order was not necessary.

¶ 11    The trial court appointed a GAL, and the matter proceeded to a hearing. The GAL testified that, as part of her duties, she conducted two phone conferences with Shem—an initial conference and a follow-up. She also conducted separate in-office interviews with Darlene and the minor, attended one of the Saturday visitations at Darlene's home, and reviewed documentation provided by the parties. During Darlene's home visit, there were numerous relatives present, and she spoke

4

with them as well. She stated that I.W. greatly enjoyed her time at Darlene's house and her visits with her aunts, uncles, and cousins. I.W. enjoyed spending the night at Darlene's house and was excited to show the GAL her bedroom and her dolls. Based on her observations and discussion with I.W., the GAL encouraged extended visits with Darlene and I.W.'s maternal family members. She noted that a cessation in visitation would be harmful. She testified that ending I.W.'s visits with her grandmother and terminated her interactions with Nicole's extended family would have a negative impact on I.W.'s emotional health. She noted that it was important for I.W. to maintain links with her maternal family. Based on her observations, she harbored no concerns for the child's safety or wellbeing during visitation. When asked to describe the relationship between Shem and Darlene, she described it as very contentious; she stated, "They hate each other."

¶ 12       The GAL recommended that visitation continue and stated it was in the best interests of the child to maintain a relationship with her maternal grandmother. However, she noted that there was displeasure expressed by both parties regarding the transportation arrangements and that the scheduled visitation times were no longer workable due to I.W.'s Saturday Polish school. The GAL suggested the times for visitation be altered from the times stated in the agreed order to 12:45 p.m. through 7 p.m. to accommodate Saturday school. She also recommended that Darlene continue to bear the responsibility of transporting the child, but that pickups and drop-offs be curbside to avoid conflict between the parties. In response to questioning about the child staying at Darlene's overnight, the GAL stated that she was not opposed to overnight visitation but thought it was unlikely to "work out" because of scheduling conflicts and the distance between the parties. The GAL believed that without a court order, no visitation between Darlene and I.W. would take place.

¶ 13        Darlene testified that she had a loving and nurturing relationship with I.W. from the time I.W. was born to the present. She was a part of I.W.'s life nearly every day for the first two years of the child's life. During Nicole's illness and treatment, Darlene cared for I.W. on a daily basis while Shem was at work. When Nicole moved to Darlene's house for hospice care, I.W. moved in with her. She described that when I.W. visits on one Saturday every month the extended family gathers together so she can become acquainted with her mother's side of the family. The gathering usually involves 16 to 17 people, consisting of cousins, aunts, and uncles. Darlene denied that she allowed I.W. to go swimming or that she fed her sweets, candy, or fast food beyond special occasions like I.W.'s birthday. She stated that she desires overnight visitation because it would mean more quality time with I.W. Darlene has no issues with having the child at church on time Sunday morning. She testified that Shem has refused to disclose his address and that he does not want her to drop I.W. off at his house. Darlene's concerns for the safety of the child stemmed from a scratch on her back and a burn on her wrist that Darlene noticed a few years ago. At the conclusion of her testimony, Darlene stated, "I feel it's important that she has a relationship with us and that it would affect her if she didn't."

¶ 14        Shem testified that Nicole went to Darlene's home for hospice care in her final days and he took I.W. to the house to be with Nicole two days later. Shem recounted events surrounding the death of Nicole that led to the contentious nature of the relationship between the parties. He disputed that Darlene was a primary caretaker of I.W. before Nicole died. He stated that when he was not working, he was the primary caretaker. He believed the complaints about the child's safety to the GAL concerning the scratch on her back and the burn on her wrist were designed to harass him and deprive him of custody of his daughter. Shem stated that he refuses to give Darlene

6

personal information such as his address or work number because it would only lead to further harassment.

¶ 15        Shem testified that scheduling visitation one Saturday every month interfered with his ability to have free time with his daughter and to enroll her in activities. Shem's free time is limited because he works and teaches catechism. On Tuesdays and Wednesdays, Shem teaches catechism until 8 p.m. and takes I.W. with him. On Thursdays, Shem works late and does not pick I.W. up from daycare until 7:30 or 8 p.m. During the school week, he helps I.W. complete her homework. Shem works overtime Saturday mornings, and I.W. attends Saturday Polish school for most of the day.

¶ 16        When addressing visitation, Shem stated that I.W. becomes frustrated, upset, and cries when she has to attend visitation with Darlene. He was frustrated by the lack of communication between him and Darlene about I.W.'s activities during visitation and that Darlene was not documenting her schedule as required by the agreed order. He did not think it was healthy for I.W. to spend three hours in a car at her age. He also described two incidents in 2018 where shortly after a Saturday visitation with Darlene, the child became seriously ill with pneumonia, requiring hospital stays. One of the incidents occurred after Darlene returned the child wearing sandals and a jacket that were inappropriate for the weather.

¶ 17        Shem wished that visitation between I.W. and Darlene could occur "organically," without the need for a court order. He claimed he would not deny visitation if there was no court order. He also claimed the once-a-month visitation prevented him from enrolling I.W. in extracurricular activities and prevented I.W.'s participation in other social events, such as attending classmates' birthday parties and visiting with his family.

7

¶ 18     The trial court found the testimony of the GAL credible and Shem's testimony regarding the child's demeanor before and after visitation incredible. The court also found no credible evidence that I.W. became ill when she returned home from visits with Darlene, that Darlene's mental or physical condition would not be appropriate for visitation to continue, or that visits one Saturday of every month would interfere with I.W.'s activities. The court emphasized that grandparent visitation enhanced the mental health of I.W., as it provided a familial link to her deceased mother and, according to the GAL, is enjoyed and desired by I.W. Further, the court noted that the child's mental and emotional health would be positively impacted by maintaining a strong and healthy relationship with her maternal grandmother.

¶ 19     The court weighed all the factors contained within section 602.9(b)(5) of the Act and found that the child's school schedule, Shem's work schedule, and the increased distance between the parties necessitated modification of the agreed visitation order to protect the child's "mental, physical[,] or emotional health." In denying Shem's motion to terminate visitation, the court left in place visitation every third Saturday of the month. However, the court did alter the transportation terms of the visitation. Specifically, the court ordered Darlene to pick up I.W. at the conclusion of the minor's Saturday school at 12:45 p.m. and ordered Shem to pick her up at Darlene's home at 6:45 p.m., unless the child is allowed to spend the night at Darlene's. If Shem allows I.W. to spend the night at Darlene's, Darlene is responsible for returning I.W. to Shem on Sunday morning to attend church. The court denied Darlene's requested modifications for expansion of visitation and other parental responsibilities, noting that an expansion of visitation beyond the once-monthly visits would interfere in I.W.'s customary activities and time spent with Shem.

¶ 20                                    II. ANALYSIS

¶ 21		On appeal, Shem contends that the trial court's decision to deny his motion to terminate grandparent visitation was against the manifest weight of the evidence. He claims there was no evidence supporting the theory that termination of visitation would cause I.W. undue mental, physical, or emotional harm. He also argues that the trial court failed to give adequate weight to the presumption in favor of a fit parent's decision regarding grandparent visitation.

¶ 22		Section 602.9 of the Act authorizes a grandparent to file a petition for visitation rights to a minor child of a deceased parent if there is an unreasonable denial of visitation by the other parent that causes "undue mental, physical, or emotional harm to the child." 750 ILCS 5/602.9(c)(1) (West 2018). The statute further provides that "there is a rebuttable presumption that a fit parent's actions and decisions regarding grandparent *** visitation are not harmful to the child's mental, physical, or emotional health." *Id.* § 602.9(b)(4). This presumption is "the embodiment of the fundamental right of parents to make decisions concerning the care, custody, and control of their children which is protected by the fourteenth amendment." *Flynn v. Henkel*, 227 Ill. 2d 176, 181 (2007). The burden is on the party filing the visitation petition to prove that the parent's decision will cause undue harm to the child. 750 ILCS 5/602.9(b)(4) (West 2018). "Neither denial of an opportunity for grandparent visitation ***, nor a child 'never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother,' *** is 'harm' that will rebut the presumption *** that a fit parent's denial of a grandparent's visitation is not harmful to the child's mental, physical, or emotional health." *Flynn*, 227 Ill. 2d at 184.

¶ 23		In determining whether to grant or deny grandparent visitation, the statute directs the trial court to consider these factors: (1) the child's wishes; (2) the child's mental and physical health; (3) the grandparent's mental and physical health; (4) the length and quality of the prior relationship between the child and the grandparent; (5) the good faith of the party filing the petition; (6) the

9

good faith of the party denying visitation; (7) the quantity of the visitation time requested and the potential adverse impact that visitation would have on the child's customary activities; (8) any other fact that establishes that the loss of the relationship between petitioner and the child is likely to unduly harm the child's mental, physical, or emotional health; and (9) whether visitation can be structured in a way to minimize the child's exposure to conflicts between the adults. 750 ILCS 5/602.9(b)(5) (West 2018). Section 602.9(c)(2) also instructs the court to consider the following: (1) whether the child resided with the grandparent for at least 6 consecutive months with or without a parent present; (2) whether the child had frequent contact with the grandparent for at least 12 consecutive months; and (3) whether the grandparent was a primary caretaker of the child for 6 consecutive months within the 24-month period prior to the commencement of the proceedings. *Id.* § 609.2(c)(2).

¶ 24    In addition to granting initial visitation, the statute contemplates modification of existing grandparent visitation orders. Section 602.9(d) of the Act is entitled "Modification of visitation orders" and states:

"The court shall not modify an order that grants visitation to a grandparent *** unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior visitation order or that were unknown to the court at the time of entry of the prior visitation order, that a change has occurred in the circumstances of the child or his or her parent, and that the modification is necessary to protect the mental, physical, or emotional health of the child. The court shall state in its decision specific findings of fact in support of its modification or termination of the grandparent *** visitation. A child's parent may always petition to modify visitation upon

10

changed circumstances when necessary to promote the child's best interests." *Id.* § 602.9(d)(2).

¶ 25 Both Shem's motion to terminate visitation and Darlene's petition to modify grandparent visitation requested modification of the agreed visitation order. Thus, section 602.9(d)(2) of the Act governs the matter before us. Section 602.9(d)(2) provides a two-pronged analysis based on the party requesting the modification. First, a grandparent may request modification and bears the burden of showing, by clear and convincing evidence, that the modification is necessary to protect the mental, physical, or emotional health of the child. Second, a child's parent may request modification at any time by demonstrating that it is in the child's best interests. See 750 ILCS 5/602.9(d)(2) (West 2018). Intertwined within the requirements of section 602.9(d)(2) is the presumption codified in section 602.9(b)(4), which has to be rebutted through a showing that the fit parent's decisions regarding visitation would result in "undue harm to the child's mental, physical, or emotional health." See *id.* § 602.9(b)(4).

¶ 26 A trial court's determination that a fit parent's decision regarding grandparent visitation is or is not harmful to the child's mental, physical, or emotional health will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *Flynn*, 227 Ill. 2d at 181. In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). A trial court's decision is against the manifest weight of the evidence only where a review of the record clearly demonstrates that the conclusion opposite to the one reached by the trial court was the proper result. *In re Anaya R.*, 2012 IL App (1st) 121101, ¶ 50. The reason for this deferential standard is that the trial court, having observed the witnesses and heard their testimony, is in the best position to make credibility determinations. *Id.*

11

¶ 27        In this case, Darlene had the burden of overcoming, by clear and convincing evidence, the presumption afforded to Shem, as well as showing that modification was required to protect the mental, physical, or emotional health of I.W. We find that she satisfied both burdens. At trial, evidence showed that I.W. would be exposed to undue mental, physical, or emotional harm if visitation with Darlene was terminated. The GAL testified that it would negatively impact I.W. if visitation with her maternal family ceased and that it was in the best interests of the child for visitation to continue. Testimony from the GAL and Darlene also demonstrated that I.W. had a strong bond with Darlene. Darlene helped care for I.W. on a daily basis for more than a year during Nicole's illness, and I.W. lived with Darlene during the last few weeks of Nicole's life. I.W. also enjoyed spending time with Nicole's extended family. The GAL testified that, given I.W.'s age, terminating her interaction with Darlene and her maternal extended family would be harmful. Our review of the record does not demonstrate that an opposite conclusion is warranted. Accordingly, the trial court's decision denying Shem's motion to terminate and modifying grandparent visitation was not against the manifest weight of the evidence.

¶ 28        Shem also claims that the trial court failed to consider the presumption that a fit parent's decision is in the child's best interests and failed to require Darlene to overcome that presumption before denying his motion to terminate visitation. We disagree.

¶ 29        At the conclusion of Darlene's case-in-chief, Shem moved for a directed verdict, claiming that Darlene failed to demonstrate that the denial of grandparent visitation was harmful to I.W.'s mental, physical, and emotion health. Citing *Flynn*, Shem argued that the burden was on Darlene to show undue harm and that she failed to meet that burden. See *Flynn*, 227 Ill. 2d at 182. After taking the matter under advisement, the trial court ruled that Darlene met the burden "to sustain

12

the *prima facie* case" and denied Shem's motion for a directed verdict. Thus, the record demonstrates that the trial court considered the presumption and found that it had been rebutted.

¶ 30 The trial court in this case found that Darlene met her burden of demonstrating that defendant's "actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health" (750 ILCS 5/602.9(b)(4) (West 2018)) and that denying grandparent visitation was not in I.W.'s best interests (*Id.* 602.9(d)(2)). The court found that I.W. had formed an attachment to Darlene and has a connection to her deceased mother's family, which, if broken, would cause I.W. mental and emotional harm. Based on our review of the record, we conclude that the court's judgment was not against the manifest weight of the evidence.

¶ 31 III. CONCLUSION

¶ 32 For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 33 Affirmed.

¶ 34 JUSTICE SCHMIDT, dissenting:

¶ 35 Factually, this is only the most recent litigation that Darlene and her husband have engaged in to eliminate or curtail Shem's fundamental constitutional right as a fit parent. As explained above, an *ex parte* order of protection was obtained preventing Shem from seeing I.W. prior to and immediately after the death of Nicole. After a court denied an extension of the order, Darlene continued to keep the child from Shem. She then filed for guardianship, with the proceedings culminating in the agreed order for visitation. Now, in her motion for modification, she asks for rights customarily reserved for parents and increased visitation. See *supra* ¶ 9. During the proceedings below, Darlene expressed concerns for the health and safety of the child that resulted in the appointment of a GAL. During trial, it came to light that these concerns emanated from a small scratch on I.W.'s back and an innocuous rash on her wrist from approximately three years

prior. Darlene contacted no one about these concerns until requesting a GAL. Shem, when referring to the litigation between he and Darlene on the whole, stated that he was "exhausted," that it was "very expensive," and that it had taken away from his ability to provide for I.W.

¶ 36  On the merits, Shem argues that the circuit court erred in denying his motion to terminate visitation as well as in granting, in part, Darlene's motion for modification. Shem's principal contention is that the circuit court did not give his decisions as a fit parent the presumption of being in the best interests of the child. He also states there was no evidence supporting the theory that termination of visitation would cause I.W. "undue mental, physical, or emotional harm." And instead, the "trial court strictly applied a best interest analysis considering the [GAL] and Darlene's testimony." Essentially, Shem asserts: (1) the lower court misapplied the law and (2) Darlene did not carry her burden.

¶ 37                              A. Shem's Motion to Terminate

¶ 38  The parties entered into an agreement for grandparent visitation. Both parties moved for modification. The majority acknowledges that the statutory section on modification of visitation governs this matter. See section 602.9(d)(2); *supra* ¶ 25. In its order, the circuit court stated that it applied a different statutory section. See section 602.9(b)(5); *supra* ¶ 19. It is evident the circuit court erred by applying section 602.9(b)(5) rather than section 602.9(d)(2).

¶ 39  The circuit court did not properly give Shem's decisions as a fit parent the required presumption of being in the best interests of the child. It is presumed that "a fit parent's decision to deny or limit [grandparent] visitation is in the child's best interests." *Wickham v. Byrne*, 199 Ill. 2d 309, 318, (2002) (citing *Troxel*, 530 U.S. at 68). As the United States Supreme Court stated, "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability

14

of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69. The majority holds that simply because the trial judge stated Darlene had established a "*prima facie* case" that the court adequately considered this presumption. *Supra* ¶ 29.

¶ 40 The lower court should have entered judgment in favor of Shem and terminated grandparent visitation. The majority recites a passage from *Flynn* which I repeat,

"Neither denial of an opportunity for grandparent visitation, as the trial court found, nor a child 'never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother,' as the appellate court held, is 'harm' that will rebut the presumption *** that a fit parent's denial of a grandparent's visitation is not harmful to the child's mental, physical, or emotional health." *Flynn*, 227 Ill. 2d at 184;

see also *Anaya R.*, 2012 IL App (1st) 121101, ¶ 57 (finding even where the grandparent in question was more "heavily involved" in the child's life than the grandmother in *Flynn,* that does not demonstrate that the "harm" resulting from denial of visitation was any different from that described in *Flynn* and, therefore, is insufficient to rebut the statutory presumption). Ergo, we are to exclude from our consideration any harm resulting from the denial of visitation. The reason why is apparent. If we were to consider this harm, almost without fail visitation would be granted and we would expose "the decision of a fit parent to the unfettered value judgment of a judge and the intrusive micro-managing of the state." *Wickham*, 199 Ill. 2d at 320-21.

¶ 41 Nonetheless, the majority's citation to this passage from *Flynn* rings hollow once it begins to apply the law to the facts of this matter. When asked about the harm from which Darlene was attempting to protect I.W., she testified that the only harm would be the denial of visitation. The

15

court in its order found there would be a negative impact on the child if visitation terminated. The GAL echoed these sentiments in her testimony. There is no other testimony concerning harm to the child outside of the cessation of the grandparent-grandchild relationship, let alone *undue* harm.

¶ 42    The court's findings that visitation would enhance I.W.'s mental health fail to comply with the harm to the child standard employed by the statute. Also, the GAL's statement and the court's finding that it would be in the child's best interests for visitation to continue are insufficient under the current version of the statute. There was no testimony that the child would experience *undue* mental, physical, or emotional harm if visitation were terminated beyond the termination of visitation itself. Darlene failed to rebut the statutory presumption afforded to Shem that his actions and decisions are not harmful to the child. See *In re Marriage of Ross*, 355 Ill. App. 3d 1162, 1168 (2005) (noting that per *Wickham* "state interference with fundamental parental child-rearing rights is justified only in limited instances to protect the health, safety, and welfare of children, such as required testing and immunizations for children and the prohibition against child labor" and that "grandparent visitation does not involve a threat to the health, safety, or welfare of children").

¶ 43                                B. Darlene's Motion to Modify

¶ 44    Venturing further, Shem also challenges the lower court's grant in part of Darlene's motion to modify. Again, absent from the court's ruling are any specific findings concerning Shem's fundamental constitutional right as a fit parent to make decisions with whom his child associates. These findings are required to support the court's modification of visitation under the language of the statute. See 750 ILCS 5/602.9(d)(2) (West 2018) ("The court shall state in its decision specific findings of fact in support of its modification or termination of the grandparent *** visitation."). Consideration of Shem's right as a fit parent was paramount to the disposition of the matter. I find the absence of even a mention of this consideration conspicuous.

16

¶ 45	Moreover, the modification made by the lower court is unsupported by the record. The court stated the agreed to visitation arrangement required alteration to minimize the child's exposure to conflicts between the adults during exchanges. As a result, Shem must now travel 3 hours and 20 minutes roundtrip to pick up his daughter at Darlene's house that contains approximately 17 relatives that are presumably sympathetic to Darlene's position, not Shem's. How this reduces the chances of conflict are beyond me. If anything, it is apparent that the lower court has lit the fuse on a powder keg. Turning to the record, it is clear that this decision is against the manifest weight of the evidence. The GAL stated that Darlene should continue to shoulder the burden of transportation. *Supra* ¶ 12.

¶ 46	The court then added the caveat that despite Shem's vehement opposition to overnight visitation, he can choose to forgo the arduous car ride and possible confrontation with a number of Darlene's extended family and, instead, have Darlene drop the child off at church in the morning. I fail to see how this scenario avoids conflict where untimeliness by Darlene would not only interfere with Shem's right to parent his child but also the exercise of his religion. This modification is also unsupported by the record as there is testimony from the GAL stating overnight visitation would be unworkable with the parties' schedules. *Supra* ¶ 12. Generally, the findings of fact made by the lower court do not support its modification of the agreed visitation order.

¶ 47	The Illinois Supreme Court when deciding a matter prior to the promulgation of the current scheme perfectly stated what should have been the disposition in this case.

> " 'In most cases, the relationship between a child and his or her grandparents
> is a nurturing, loving relationship that provides a vital connection to the
> family's history and roots. However, as with all human relationships,

17

conflicts may arise between a child's parents and grandparents. In many cases, this conflict will concern disagreements about how a parent is raising his or her children. Yet, this human conflict has no place in the courtroom. This is true even where the intrusion is made in good conscience, such as the request for visitation to preserve the child's only connection to a deceased parent's family. Parents have the constitutionally protected latitude to raise their children as they decide, even if these decisions are perceived by some to be for arbitrary or wrong reasons. The presumption that parents act in their children's best interest prevents the court from second-guessing parents' visitation decisions. Moreover, a fit parent's constitutionally protected liberty interest to direct the care, custody, and control of his or her children mandates that parents—not judges—should be the ones to decide with whom their children will and will not associate.' " *In re M.M.D.*, 213 Ill. 2d 105, 118-19 (quoting *Wickham*, 199 Ill. 2d at 321-22).

¶ 48 We should reverse the lower court and enter judgment in favor of Shem.