No. 2--06--0573                                              filed: 11/27/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| CINDY FLYNN, | ) | Appeal from the Circuit Court |
| | ) | of Lee County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05--F--75 |
| | ) | |
| ALICE HENKEL, | ) | Honorable |
| | ) | Charles T. Beckman, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the opinion of the court:

Respondent, Alice Henkel, appeals from the judgment of the trial court granting visitation of her son, E.H., to petitioner, Cindy Flynn, E.H.'s paternal grandmother. We affirm.

We first note that Cindy has failed to file a brief in this case. However, we will consider this appeal pursuant to the principles set forth in First Capitol Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128, 131-33 (1976).

E.H. was born on May 27, 2003. His parents, Alice Henkel and Cory Flynn, were never married. E.H. lived with his mother and maternal grandparents. On December 22, 2005, Cindy filed a petition for grandparent visitation. The parties agreed to a trial visitation period that lasted for two visits each in January and in February 2006. When no further agreement could be reached, the court held a hearing on the petition on April 21, 2006. The court granted the petition, allowing

three hours of unsupervised visitation on the second Saturday of each month with certain restrictions. This appeal followed.

Alice now contends that the trial court erred in granting Cindy's petition. A trial court's determination regarding visitation is within its sound discretion, and this court will not disturb such a finding absent a showing of manifest injustice. McVey v. Fredrickson, 226 Ill. App. 3d 1082, 1083-84 (1992).

Grandparent visitation is provided for in section 607 of the Illinois Marriage and Dissolution of Marriage Act (Act), which provides in relevant part:

"(a--5)(1) Except as otherwise provided in this subsection (a--5), any grandparent, great-grandparent, or sibling may file a petition for visitation rights to a minor child if there is an unreasonable denial of visitation by a parent and at least one of the following conditions exists:

* * *

(E) the child is born out of wedlock, the parents are not living together, the petitioner is a paternal grandparent, great-grandparent, or sibling, and the paternity has been established by a court of competent jurisdiction.

***

(3) In making a determination under this subsection (a--5), there is a rebuttable presumption that a fit parent's actions and decisions regarding grandparent, great-grandparent, or sibling visitation are not harmful to the child's mental, physical, or emotional health. The burden is on the party filing a petition under this Section to prove that the

parent's actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health." 750 ILCS 5/607 (a--5) (West Supp 2005).

Alice, called as an adverse witness, testified that, shortly after E.H. was born, Cindy, her husband Mike, and Cory visited E.H. once a week at Alice's house. In December 2003, the visitation "slowed down" after a court order was entered requiring visitation involving Cory to be supervised. Cindy continued to contact Alice to arrange visitation on holidays. In June 2004, Cory filed a petition seeking to have his parents approved as supervisors of his visits with E.H., but the petition was denied. Cindy last attended a supervised visitation at Sinnissippi[1] in May 2005. There had been no other visitation between Cindy and E.H. until the four agreed-upon visits in January and February 2006. Alice thought that Cindy disrespected her wishes at the first visit because Cindy did not always refer to herself and her husband as Grandma Cindy and Grandpa Mike, as Alice had requested. Since then, Cindy had requested unsupervised visitation of one hour per month, but Alice did not agree to it.

Alice was opposed to any visitation for Cindy. She did not understand why it was important to Cindy to be involved in E.H.'s life, especially when Cindy chose not to attend the supervised visitation that had been allowed. Alice had "a problem with Cindy and her religious beliefs" and thought that Cindy "never respected" her as a parent. Alice thought that E.H. had benefitted from living with Alice's mother, who would be devastated if she were no longer able to see E.H.

Cindy testified that she first learned of E.H.'s birth one month after he was born. She and her husband, Mike, visited E.H. at the home of Alice's parents that same night. They arranged to visit

---

[1]Sinnissippi Centers, Inc., is a community-based behavioral healthcare center that has provided care to Illinois residents of Carroll, Lee, Ogle, and Whiteside Counties for 40 years.

once a week and, after a few weeks, arranged to visit twice a month for two hours. Cindy and Mike attended E.H.'s baptism in June 2003. In July, Cory filed a petition to get visitation with his son. Alice called Cindy and told her that she could no longer visit with E.H. Cory was eventually granted supervised visitations at Sinnissippi; the order also stated that Cindy could not see E.H. without Cory. Cindy attended "every one" of the visits at Sinnissippi. Eventually, Cory and Alice agreed to have the supervised visits at Alice's house, and Cindy stopped going to the visits. Cindy tried to convince Cory to occasionally have visitation at Sinnissippi so that she could visit E.H., but Cory disliked visiting in a four-foot by four-foot room, which he thought adversely affected E.H. At some point, Cory stopped visiting with E.H. Cindy contacted Alice to see if she could visit without Cory. When she was rebuffed, she filed her petition for visitation.

Cindy described the visits in January and February 2006 as "[e]xcellent," and said of the first January visit:

"Oh, he brings, he brings such joy to me. He's such a, they have done a wonderful job with [E.H.] and I appreciate that they have [E.H.]. I do, and I have no animosity whatsoever. I just want to be part of [E.H.'s] life. He deserves it and I deserve it."

Cindy thought that E.H. would benefit from having her in his life. She also said that she had a goddaughter who called her and her husband nana and papa, and that she immediately apologized to Alice when they used those names in talking to E.H.

Cindy said that she would have no problem abiding by a court order that would prohibit her sons Cory and Derrick from participating in any visits or from discussing religion during the visits. She would prefer unsupervised visitation but would take whatever the judge granted.

Alice then moved for a directed finding, arguing, among other things, that Cindy did not meet the burden of proof that denying visitation would harm E.H.'s mental, physical, or emotional health. The trial court denied the motion.

Alice's mother, Rita H., testified that E.H. had resided with her since birth. She kept notes about visitations, starting in December 2003. She recorded twice-monthly visits with Cindy and Cory between December 2003 and March 2004. Rita thought that Cindy and Cory acted inappropriately at the December 8, 2003, visitation, verbally attacking Alice and her in front of E.H. She also thought that, in general, Cindy tried to "take over" and "didn't seem real concerned about what the usual was" during visits. During the period of April through June 2004, Cindy visited once a month, and the visits then shifted to Sinnissippi, where there were usually two visits a month through the end of 2004. Rita stopped taking notes late in 2004. Cory, without Cindy, visited E.H. approximately five hours between October 2004 and the autumn of 2005.

During Alice's pregnancy, Cindy "tried to make some contact" with Alice; she "called a couple of times" and tried to "send some things out for the baby and stuff." Alice "asked her to respect her and let her deal with this and go through this time alone and, you know, get her thoughts together." Alice also told Cindy that, if she would support her "in helping Cory become the kind of person that [E.H.] can respect, we will go from there and let a natural relationship develop natural [sic], just let it develop with no expectations" and no court orders. According to Rita, "things were okay until [Cory] took, [sic] took Alice to court to establish his paternity." Alice did not like to be around Cindy and found her "very intimidating." Alice "would prefer" that there be no visitation between Cindy and E.H.

Rita agreed that she would be "incredibly devastated" if "E.H. was taken away" from her. She was able to visit her other grandchildren because she did not "make demands of their parents that they come and see me or that I go there." She thought that Cindy should be denied the right to develop a relationship with E.H. "[i]f she's not going to respect Alice's wishes." When asked about instances in which Cindy did not respect Alice's wishes, Rita related several instances in which Cindy brought other people, including her son Derrick, her great niece, and a friend of Cory to visits with E.H. She also related that Cindy was very upset when Alice had tubes placed in E.H.'s ears because of chronic ear infections. However, Cindy complained to Rita, not Alice, and Rita could not think of any instance in which Cindy said or did anything disrespecting Alice's wishes in Alice's presence.

Testifying on her own behalf, Alice could not think of any specific examples of Cindy criticizing her parenting, other than the episode involving the insertion of tubes into E.H.'s ears. However, Cindy never spoke to her about it; Rita told her about Cindy's complaints. If the court were to grant Cindy's petition, Alice wanted visitation to be supervised, preferably by Rita. She also wanted the visitation to take place in her home, stating, "If they want to be a part of his life, then they need to be a part of his life and his life is our home." She did not believe that it would be harmful to E.H. if he did not visit with Cindy.

The trial court granted Cindy's petition, concluding:

"Okay. Based on the testimony presented the Court finds that the petitioner has met her burden. The harm in this case is not something that you can put in the sense of a direct emotional harm. It's a direct denial of an opportunity that every grandparent according to this

statute is entitled to. Generally, as in the case apparently of [Rita's] other children, that comes on a voluntary basis. In this case it hasn't."

The court then specifically addressed each of the considerations enumerated in sections 607(a--5)(4)(A) through (4)(J) of the Act (750 ILCS 5/607(a--5)(4)(A) through (4)(J) (West Supp. 2005)). The court found that E.H. was not old enough to make known his wishes regarding visitation. Both E.H. and Cindy were in good health. There was a relationship between E.H. and Cindy, although the court found that the relationship "was in [Cindy's] attempt to get her son to probably be a better father." The court found that Cindy filed the visitation petition in good faith, but the court had "some difficulty" with Alice's good faith in denying visitation, finding that she "has taken the approach that her son is better off without this set of grandparents with or without good cause." The court found "nothing that shows" that the quality and quantity of the requested visitation would have any adverse impact on E.H.'s customary activities. E.H. and Cindy did not reside together, but the court found that they had had frequent or regular contact for at least 12 consecutive months, as Rita had testified that Cindy had visited for 14 consecutive months at one point. The court then ordered the unsupervised visitation.

Alice first argues that the trial court abused its discretion in determining that her denial of visitation was unreasonable under section 607(a--5)(1) of the Act (750 ILCS 5/607(a--5)(1) (West Supp. 2005)). Alice points to her testimony that, if the court were to grant visitation, she would prefer supervised visitation on her property. This argument misses the point. It is not the reasonableness of Alice's grudging acceptance of potential court-ordered visitation that is at issue but the reasonableness of the denial of visitation that prompted the filing of the petition seeking visitation. On appeal, a reviewing court will take questions of witness credibility as resolved in

favor of the prevailing party and must draw from the evidence all reasonable inferences that support the judgment. In re Estate of Coleman, 262 Ill. App. 3d 297, 302 (1994). In this case, the record indicates that the trial court found that Alice did not have a reasonable basis to refuse visitation. The trial court specifically found, pursuant to section 607(a--5)(4)(F) of the Act (750 ILCS 5/607(a--5)(4)(F) (West Supp. 2005)), that it had "some difficulty" with Alice's good faith in denying visitation and that Alice "has taken the approach that her son is better off without this set of grandparents with or without good cause." The evidence and reasonable inferences drawn from it support these findings.

The evidence shows that voluntary visits between Cindy and E.H. began shortly after his birth. There is no indication of any problems during this period, and Alice sought to let a "natural relationship develop." According to Rita, things were fine until Cory sought to establish his paternity. At that point, Alice terminated Cindy's visitation. When Cory was granted supervised visitation with E.H., Cindy was allowed to attend with Cory but was prohibited from visiting without Cory. When Cory stopped visiting, Cindy was denied any further visitation.

The evidence demonstrates only unreasonable bases for denying visitation. Alice found Cindy "very intimidating" and did not like to be around her. Both Alice and Rita spoke generally of Cindy's lack of respect for Cindy's parenting skills and wishes, but could come up with few specifics. Alice could not understand why it was important for Cindy to be involved in her grandson's life even though she understood that her own mother would be devastated if she could not see him. The fact that Alice terminated what was described as normal visitation because the child's father sought to establish his paternity demonstrates that the denial of visitation was merely retaliatory and punitive and patently unreasonable. We cannot conclude that the trial court's

determination that the denial of visitation was unreasonable was against the manifest weight of the evidence.

Alice next argues that Cindy failed to prove that denying visitation was harmful to E.H.'s mental, physical, or emotional health, as required by section 607(a--5)(3) of the Act (750 ILCS 5/607(a--5)(3) (West Supp. 2005)). This subparagraph was added to section 607 after our supreme court found section 607(b)(1) of the Act unconstitutional in Wickham v. Byrne, 199 Ill. 2d 309 (2002). Section 607(b)(1) provided for, among other things, grandparent visitation where "the court determines that it is in the best interests and welfare of the child." 750 ILCS 5/607(b)(1) (West 2000). Our supreme court determined that section 607(b)(1) "place[d] the parent on equal footing with the party seeking visitation rights" and "expose[d] the decision of a fit parent to the unfettered value judgment of a judge and the intrusive micromanaging of the state." Wickham, 199 Ill. 2d at 320.

Alice's argument is twofold. First, she argues that the trial court focused on the harm to the grandparent, not the harm to the child. We disagree.

In announcing its ruling, the trial court stated:

"Okay. Based on the testimony presented the Court finds that the petitioner has met her burden. The harm in this case is not something that you can put in the sense of a direct emotional harm. It's a direct denial of an opportunity that every grandparent according to this statute is entitled to. Generally, as in the case apparently of [Rita's] other children, that comes on a voluntary basis. In this case it hasn't."

The trial court specifically mentioned Cindy's burden and the harm that is the basis of that burden. The court's inability to articulate the harm "in the sense of a direct emotional harm" clearly indicates

that it was referring to E.H.; the emotional harm to Cindy if she were not allowed to visit her grandchild would be direct and manifest. While the court spoke of a grandparent's opportunity being denied, the harm that the court found was the harm to the child. As harm, not opportunity, is the basis of a petitioner's burden, we do not conclude that the court used the wrong burden.

Alice then argues that the trial court improperly applied the old section 607(b)(1) "best interests of the child" standard in determining that Cindy overcame the burden of section 607(a--5)(3). According to Alice, the record contains nothing that rebuts the statutory presumption that her actions and decisions regarding visitation are not harmful to E.H.'s mental, physical, or emotional health. We disagree.

The harm that E.H. would suffer if there were no visitation can be inferred from the evidence. As the trial court stated, it "is not something that you can put in the sense of a direct emotional harm." However, Cindy's love for E.H. is manifest in the record. She tried to become involved with Alice even before E.H. was born and sent items for the baby. She came to visit E.H. the very night that she learned that he had been born. As Cindy said, "I just want to be part of [E.H.'s] life. He deserves it and I deserve it." If Cindy were denied visitation, E.H. would be harmed by never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother. There was no evidence that the prior visitation interfered with Alice's relationship with E.H., and the evidence showed that Cindy would abide by any restrictions that the court placed on future visitation. We can find no error in the trial court's finding that Alice's denial of visitation was harmful to E.H.'s mental, physical, or emotional health, and we find no abuse of discretion in the court's order granting visitation.

For these reasons, the judgment of the circuit court of Lee County is affirmed.

Affirmed.

GILLERAN JOHNSON, J., concurs.

JUSTICE KAPALA, dissenting:

Because I believe that the trial court abused its discretion when it granted petitioner visitation with E.H. (see McVey, 226 Ill. App. 3d at 1083-84), I respectfully dissent. Section 607(a--5)(3) of the Illinois Marriage and Dissolution of Marriage Act places the burden on a petitioner for grandparent visitation to "prove that the parent's actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health." 750 ILCS 5/607(a--5)(3) (West Supp. 2005). The majority concludes that the harm E.H. would suffer from a denial of visitation with his paternal grandmother can be inferred from the evidence. I disagree.

The majority states that, if petitioner were denied visitation with E.H., "E.H. would be harmed by never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother." Slip op. at 10. However, I find no evidence in the record to show how E.H. would react to a lack of visitation with his grandmother. I believe section 607(a--5)(3) requires a petitioner for grandparent visitation to show direct harm to a child beyond the general idea that any child would be disadvantaged by a denial of visitation with a grandparent who loves him. Consequently, I do not agree that petitioner has met her burden in this case.

The burden placed on petitioner by section 607(a--5)(3) is best understood in light of our supreme court's decision in Wickham, 199 Ill. 2d 309. In Wickham, our supreme court found the former statute granting grandparent visitation (750 ILCS 607(b)(1), (b)(3) (West 2000)) unconstitutional. Wickham, 199 Ill. 2d at 320-21. The Wickham court held that the statute interfered with parents' fourteenth amendment right to the care, custody, and control of their children

because it failed to accord some special weight to a fit parent's determination of her child's best interest. Wickham, 199 Ill. 2d at 317. While the court recognized that the state may interfere with a parent's right to the care, custody, and control of her child to protect the health, safety, or welfare of the child, it found no compelling interest in the case before it that would justify such an intrusion on this right. Wickham, 199 Ill. 2d at 317. In fact, in Wickham, our supreme court compared other instances when a child's health, welfare, and safety had justified the state's intrusion. These instances included required testing for phenylketonuria at birth, required immunization for diphtheria, required hearing and visual examinations, and prohibited child labor. Wickham, 199 Ill. 2d at 317.

Following the Wickham decision, the legislature enacted section 607(a--5)(3), which placed the burden on a petitioner for grandparent visitation to rebut the presumption that a parent's actions regarding visitation are not harmful to the child's health, and to prove that the parent's decisions regarding visitation times are harmful to the child's health. 750 ILCS 5/607(a--5)(3) (West Supp. 2005). These provisions address the flaws in the previous statute raised by the Wickham court and place on a petitioning grandparent the burden to show such harm to a child that would justify the state's intrusion on a parent's constitutional rights.

In this case, not only has petitioner failed to present any evidence to show that a lack of visitation will result in harm to E.H.'s mental, physical, or emotional health, but even the trial court commented in its finding that "the harm in this case is not something that you can put in the sense of a direct emotional harm." Petitioner presented no evidence about E.H.'s level of attachment to her, E.H.'s reaction to the cessation of visitation, or E.H.'s overall emotional, mental, and physical health. Although these factors are surely not the only factors to consider when deciding if harm to the child would occur, they demonstrate some evidence a petitioner may present to meet her burden

under section 607(a--5)(3). In this case, the only evidence of the potential effect of a lack of visitation on E.H. was petitioner's testimony that E.H. "hugs me, he holds me" when he sees her. This alone does not show that E.H. would be harmed by his mother's decision to deny visitation with his paternal grandmother.

Moreover, if the harm referred to in section 607(a--5)(3) includes the general proposition that any child is harmed by his parent's refusal to allow visitation with a grandparent who loves him and does not undermine the child's relationship with his parent, the breadth of the statute would conflict with the holdings of Wickham. Wickham, 199 Ill. 2d at 317 ("The issue we address does not involve a threat to the health, safety, or welfare of children. Unlike the statutes concerning inoculation or immunization, sections 607(b)(1) and (b)(3) involve visitation and a parent's decision to control who may interact with his or her children"). In light of Wickham, I believe the showing of harm required by section 607(a--5)(3) is a requirement that a petitioner present evidence that the particular child will be physically, emotionally, or mentally harmed by his parent's visitation decisions, and is not a general idea that any child is harmed by a lack of visitation with any grandparent who loves him.

Because the evidence presented to the trial court in this case did not offer any insight into the effect on E.H. of the denial of petitioner's visitation, the trial court's decision to grant petitioner visitation would result in manifest injustice. See McVey, 226 Ill. App. 3d at 1083-84. Consequently, I believe the trial court abused its discretion when it found that petitioner met her burden of showing the denial of petitioner's visitation with E.H. would cause E.H. physical, emotional, or mental harm. As she failed to show any harm to E.H., petitioner failed to fulfill the requirements of section 607(a--5)(3). Therefore, I respectfully dissent.