# Illinois Official Reports

## Appellate Court

<br>

### *Robinson v. Reif*, 2014 IL App (4th) 140244

<br>

| | |
|---|---|
| Appellate Court Caption | PAUL W. ROBINSON and LINETTE R. ROBINSON, Plaintiffs-Appellees, v. ANDREW REIF, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0244 |
| Filed | November 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings under the grandparent visitation statute arising from the death of the mother of two children and the severe injury of their father in an automobile accident and the father's 18-month rehabilitation while the children lived with plaintiffs, the children's maternal grandparents, the trial court's decision granting plaintiffs visitation was affirmed, since plaintiffs raised the children during their father's rehabilitation, and even though the subsequent contentious court battle to retain custody soured the relationship between plaintiffs and the children's father and his new wife and confused the children, the evidence supported the trial court's finding that plaintiffs demonstrated that the children's mental, physical, or emotional health was harmed by their father's actions and decisions as to visitation times and that any harm that might result from regular visitation with plaintiffs was overcome by the harm that would result from terminating the bond that was created while the children lived with plaintiffs. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 11-F-427; the Hon. James R. Coryell, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Andrew D. Bourey, of Bourey Law Offices, of Decatur, for appellant.

Michael K. Goldberg and Elizabeth E. Stubbins, both of Goldberg Law Group, LLC, of Chicago, for appellees.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Appleton and Justice Turner concurred in the judgment and opinion.

## OPINION

¶ 1    In March 2010, a car accident killed 22-year-old Casey Robinson-Reif and left her husband, defendant, Andrew Reif, severely injured and in need of prolonged hospitalization and rehabilitation. For 18 months thereafter, the couple's minor children, G.R. (born October 10, 2007) and E.R. (born August 5, 2009), lived with their maternal grandparents, Paul W. Robinson and Linette R. Robinson (collectively, plaintiffs). In August 2011, defendant–now recovered and remarried–successfully regained custody of his children after a contentious court battle. Defendant and his new wife moved with the children to New Mexico, cutting off all contact with plaintiffs.

¶ 2    In September 2011, plaintiffs filed a verified petition for permanent and temporary grandparent visitation pursuant to section 607(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act) (commonly known as the grandparent visitation statute) (750 ILCS 5/607(a-5) (West 2010)). In March 2014, following a November 2013 hearing, the trial court granted plaintiffs' petition and set a visitation schedule.

¶ 3    Defendant appeals, arguing that (1) plaintiffs lacked standing under section 607(a-5)(1) of the Act (750 ILCS 5/607(a-5)(1) (West 2010)) because defendant did not unreasonably deny visitation and (2) the trial court's judgment was against the manifest weight of the evidence because plaintiffs failed to rebut the statutory presumption that defendant's actions and decisions regarding grandparent visitation were not harmful to the children's mental, physical, or emotional health. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The following facts were gleaned from the parties' pleadings and other supporting documents filed with the trial court, as well as the evidence presented at the November 2013 hearing on plaintiffs' petition.

¶ 6                         A. Events Preceding Plaintiffs' Petition

¶ 7    In December 2006, defendant and Casey married in Decatur. In February 2007, Casey moved to El Paso, Texas, to live with defendant, who was stationed at the Army base at Fort Bliss. G.R. and E.R. were both born on the base. In March 2010, the family decided that Casey and the two children would move back to Illinois. During the drive to Illinois, the family's

car–driven by defendant–was involved in a rollover accident, which resulted in Casey's death and severe injuries to defendant. The children, who were uninjured, lived the next 18 months with plaintiffs in Decatur while defendant recovered. After defendant recovered and remarried, plaintiffs sought to keep custody of the children. The court battle for custody, which defendant ultimately won, caused seemingly irreparable damage to plaintiffs' relationship with defendant. Once defendant settled in New Mexico with his new wife and the children, he ignored plaintiffs' repeated attempts to contact him, eventually changing his phone number.

¶ 8                        B. Plaintiffs' September 2011 Petition

¶ 9        In September 2011, plaintiffs filed their petition for grandparent visitation pursuant to section 607(a-5) of the Act, seeking a permanent visitation order. The petition alleged, in pertinent part, that (1) defendant cut off contact with plaintiffs and unreasonably denied plaintiffs visitation with the children; (2) the children developed significant mental and emotional bonds with plaintiffs; (3) defendant's termination of plaintiffs' relationship with the children was not in good faith; and (4) the termination of plaintiffs' relationship with the children had caused, and will continue to cause, the children to suffer mentally and emotionally. Plaintiffs' petition set forth 25 specific factual allegations to illustrate the bonds that had formed between plaintiffs and the children. (For example, plaintiffs alleged that "[t]he minor children enjoyed riding their bikes and planting flowers with [plaintiffs,]" and "[E.R.] sometimes called Grandmother, 'Mommy.' ")

¶ 10       While plaintiffs' petition was pending, the trial court allowed (1) weekly phone calls between plaintiffs and the children, (2) three personal visits in the Texas/New Mexico area, and (3) one personal visit in Decatur, which required plaintiffs to make two round-trip flights to El Paso to retrieve and drop off the children.

¶ 11                  C. The November 2013 Hearing on Plaintiffs' Petition

¶ 12       In November 2013, after more than two years of continuances, the trial court held a hearing on plaintiffs' petition, at which the parties presented the following evidence.

¶ 13                              1. *Plaintiffs' Evidence*

¶ 14                              a. Linette's Testimony

¶ 15       Linette (born August 1969) testified that she and Paul (born June 1971) had been married for 20 years. Linette is employed as a clinical pharmacy technician and Paul is a trucking supervisor for Archer Daniels Midland Company. Prior to Casey's death, plaintiffs were very close with defendant and the children. The parties would visit each other in El Paso and Decatur and make regular phone calls on holidays and birthdays.

¶ 16       At 4:45 a.m. on March 12, 2010, police called plaintiffs' home to inform them that defendant, Casey, and the children had been in a rollover accident on Interstate 40 near Tucumcari, New Mexico. After plaintiffs pleaded for more information, the officer revealed that Casey had died. The children were fine, but defendant had been airlifted in critical condition to Amarillo, Texas, and the local authorities would be placing the children in foster care for the time being. Within a half hour, plaintiffs were on the road making the 15-hour drive from Decatur to Amarillo to retrieve the children. Plaintiffs spent three days in Texas

before returning to Decatur. During that time, they visited defendant in the hospital and purchased baby formula for E.R., who had until then been nursing from Casey.

¶ 17 Defendant suffered serious brain injuries in the accident, which required him to be placed in a medically induced coma for two weeks. For the next several months, while defendant was hospitalized in Amarillo and Chicago, G.R. would regularly ask plaintiffs where his mother was. Plaintiffs would explain that she had gone to heaven and that they missed her too. Plaintiffs traveled with the children to the hospital in Amarillo to visit defendant for Easter, then to the hospital in Chicago several times to visit defendant while he was in rehabilitation. Following his hospitalization in Chicago, defendant spent May and June living in plaintiffs' home. At the end of June, the Army recalled defendant to Fort Bliss. According to Linette, defendant wanted the children to remain in Decatur with plaintiffs because plaintiffs "were doing a great job with [the children] and [defendant] felt comfortable to leave them."

¶ 18 Plaintiffs assumed complete care and parenting responsibilities for the children during the 18 months following the car accident. This included feeding, toilet training, arranging day care, throwing birthday parties, traveling to visit extended family, and taking the children to activities such as pottery classes, festivals, children's museums, and the zoo.

¶ 19 When defendant was living with plaintiffs during his recovery, he contributed little to basic parenting duties, such as changing diapers or feeding the children. Linette stated that defendant would "come and go all hours of the day and night," and "he didn't interact with [the children] a whole lot." In late 2010 and the early months of 2011, after defendant had returned to Fort Bliss, Linette noticed a change in defendant's mood. Specifically, defendant became "threatening" to plaintiffs and showed signs of depression, hallucinations, forgetfulness, and suicidal thoughts. (Linette gleaned much of this information from defendant's Facebook page.) In late January 2011, defendant told plaintiffs that he was in a relationship and he intended to take the children with him to Texas. Linette told defendant, who was living in the Fort Bliss barracks at the time, that she was not comfortable giving the children to him.

¶ 20 In February 2011, defendant married his second wife, Tiffany. Shortly thereafter, plaintiffs filed for an emergency order of protection against defendant, which the trial court granted. However, plaintiffs soon dropped the emergency order of protection and instead filed a renewed petition for temporary guardianship, which the court also granted. (The record before us does not contain any pleadings or other court documents from the proceedings on the emergency order of protection or the petitions for temporary guardianship.)

¶ 21 After the trial court granted plaintiffs' renewed petition for temporary guardianship in March 2011, the litigation over custody of the children continued, with plaintiffs taking the position that defendant was not competent to care for the children. In August 2011, after defendant took a court-ordered mental evaluation, the trial court returned the children to defendant's custody. Linette testified that the children were upset and crying when they learned that they would be returned to defendant. After defendant took custody of the children, all his communication with plaintiffs ceased.

¶ 22 At the four visits during the pendency of plaintiffs' petition for grandparent visitation, the children were very excited to see plaintiffs. During the Decatur visit in May 2012, defendant's parents (who also lived in Decatur) came to plaintiffs' home to visit with the children. The children slept in their old bedrooms, which plaintiffs had preserved for them. The children were upset when it came time to return to El Paso.

¶ 23     At the conclusion of Linette's testimony, the trial court admitted several pages of photos showing the children interacting with plaintiffs. (The photos, which appear to have been taken between G.R.'s infancy and the May 2012 visit, generally show the children appearing happy and content.)

### b. Mary McMillan's Testimony

¶ 25     Mary McMillan, who had been best friends with Casey, visited plaintiffs' home almost daily after Casey's death. McMillan testified that during the 18 months following Casey's death, "[plaintiffs] were, for all intents and purposes, the parents." The children were very close with plaintiffs, and they would run to the window whenever they saw Linette or Paul arrive home. According to McMillan, when the children visited plaintiffs' home in May 2012 after being away since August 2011, "they loved being there. It was as if they never left." McMillan never heard plaintiffs talk poorly about defendant in front of the children.

### c. Shirley Cooper's Testimony

¶ 27     Shirley Cooper, Linette's mother, was present for the August 2011 transfer of the children from plaintiffs' custody to defendant's custody. Both children were crying and screaming as defendant and Tiffany strapped them into their car seats.

### d. Defendant's Testimony

¶ 29     Defendant, testifying as an adverse witness, stated that he was 26 years old and lived in Las Cruces, New Mexico. Defendant acknowledged that plaintiffs and the children love each other. However, when asked if he would allow plaintiffs to visit the children if they dismissed their petition for grandparent visitation, defendant stated, "we're in court right now, so I can't answer that question. I have no idea."

¶ 30     On cross-examination by his own counsel, defendant testified that in August 2011, after he regained custody of the children, he sent an e-mail to plaintiffs informing them that he had changed his phone number and was discontinuing all contact between his family and plaintiffs "for the time being."

¶ 31     Defendant also noted that when he and Tiffany retrieved the children after the December 2011 visit, G.R. was wearing a diaper, despite being completely toilet trained. Following that visitation, G.R. began having nightmares and wetting the bed. G.R. would also become scared and have nightmares after the weekly phone calls with plaintiffs. Before the children visited plaintiffs, defendant would attempt to "hype up" the children and get them excited for the visit. However, G.R. would react by becoming sad and having emotional outbursts.

### e. Paul's Testimony

¶ 33     Paul testified that prior to the car accident, he and Linette would video-chat with Casey and the children several times each week.

¶ 34     Paul further stated that defendant sent his August 2011 e-mail, which informed plaintiffs that he was cutting off visitation, to an unused e-mail address belonging to plaintiffs' adult son, Pauley. Paul never received defendant's August 2011 e-mail.

¶ 35                                  f. Dr. Judy Osgood's Testimony

¶ 36        Dr. Judy Osgood, a licensed clinical psychologist specializing in children and families, testified that she believed it was important for plaintiffs to have visitation with the children and that a lack of visitation would harm the emotional well-being of the children. Osgood based this opinion on (1) her review of the records of the legal proceedings; (2) pictures and videos of plaintiffs interacting with the children throughout their lives; (3) entries that defendant posted on Facebook in 2011; (4) clinical interviews with Linette, Paul, and Pauley; and (5) the evidence depositions of defendant's expert witnesses (discussed in further detail, below).

¶ 37        Osgood opined that plaintiffs are high-functioning, stable, and responsible people. Neither presented any risk factors–such as substance abuse, criminal history, domestic violence, or mental disorders–to cause Osgood concern regarding visitation. Osgood acknowledged that she had never directly spoken with or observed the children. However, the consensus in the psychological community is that young children develop attachments to their caregivers, who provide consistency, security, trust, and comfort. Based upon her review of photos and videos, Osgood concluded that the children understood plaintiffs as their primary caregivers and attachment figures during the 18 months following the car accident, which was a "critical development stage" for both children. If the children were cut off from plaintiffs, it would cause a major disruption in their lives. Further, at least for G.R., who remembers Casey, the permanent loss of visitation with plaintiffs would constitute a second major disruption in his life after the death of his mother.

¶ 38        Osgood further testified that children who have healthy relationships with grandparents and other extended family are much more capable of having healthy relationships with others as they grow older. On the other hand, according to Osgood, children who experience multiple losses of caregivers–such as children in and out of foster care–tend to develop reactive attachment disorder, which causes them difficulty in establishing and maintaining new healthy relationships.

¶ 39        On cross-examination, Osgood acknowledged that it would have been beneficial for her to meet the children to determine whether an attachment between plaintiffs and the children existed. Ideally, a practitioner would be able to observe the children interacting with both the grandparents and the parents for an extended period of time before forming such an opinion. Osgood clarified that, assuming plaintiffs' representations of the facts were accurate, she could form an expert opinion as to visitation.

¶ 40        At the conclusion of Osgood's testimony, the trial court admitted without objection a 12-page "visitation evaluation" prepared by Osgood (dated October 30, 2012), which was largely consistent with her testimony. Osgood noted in her report that, according to plaintiffs, defendant was not in contact with his own parents (the children's paternal grandparents).


¶ 41                                        2. *Defendant's Evidence*
¶ 42                                        a. Defendant's Testimony

¶ 43        Defendant testified that plaintiffs disparaged him during the 2011 court proceedings. (We again note that the record contains no pleadings, transcripts, or other court documents from those proceedings.) In June 2011, on the morning after the trial court ordered plaintiffs to return the children to defendant, plaintiffs and defendant sat down for a meeting to discuss the transition. Although the court had ordered a 60-day transition period, plaintiffs told defendant

that they did not intend to return the children until the evening of the 59th day. Linette further told defendant that he "had not suffered enough" and that he remarried too soon. Linette told Tiffany that "she would never be a mommy," and "she would never be able to take care of the children" because she was too young and she did not give birth to them. The animosity between the parties prevented any agreement as to the terms of the transition.

¶ 44     According to defendant, visits and phone calls with plaintiffs were harmful to the children. G.R.'s nightmares and bed-wetting always coincided with visits and phone calls with plaintiffs. Shortly after the December 2011 visit, defendant placed G.R. in counseling. G.R.'s nightmares and bed-wetting became more intense after the May 2011 visit in Decatur. Soon, G.R. was seeing a counselor at least once per week. On one occasion, plaintiffs failed to abide by defendant's instructions that E.R. wear a certain brand of diapers and use a certain type of medication for diaper rash. When plaintiffs returned E.R. to defendant, she had a diaper rash that required a visit to the doctor. During the most recent visit in New Mexico, however, the children were allowed to sleep in defendant's home each night after spending the day with plaintiffs. Defendant noticed a "substantial decrease" in G.R.'s nightmares and bed-wetting after that visit.

¶ 45                               b. Tiffany's Testimony

¶ 46     Tiffany, who became the adoptive mother of the children in February 2013, testified that plaintiffs returned G.R. after the December 2011 visit wearing a diaper, which he had completely soiled. At the time, G.R. had already been toilet trained and was used to wearing regular underwear. Following the May 2012 visit, as plaintiffs and the children were walking toward defendant and Tiffany in the El Paso airport, G.R. wet himself. For several days following that visit, G.R. was withdrawn and E.R. was "more sensitive to sounds."

¶ 47                          c. Dr. Robert DelCampo's Testimony

¶ 48     Dr. Robert DelCampo–a marriage and family therapist licensed in New Mexico–testified in December 2012 by means of evidence deposition, the transcript of which the trial court admitted at the November 2013 hearing.

¶ 49     DelCampo testified that between April 2012 and December 2012, he met with defendant, Tiffany, and the children together on four or five separate occasions. During those meetings, DelCampo would observe defendant and Tiffany interact with the children. DelCampo characterized defendant and Tiffany's parenting as "very positive."

¶ 50     DelCampo admitted that most of his knowledge about the children's reactions and attitudes toward plaintiffs was based upon information provided to him by defendant and Tiffany. In summer 2012, defendant informed DelCampo that the children "were having night terrors and not wanting to go with [plaintiffs]." According to what DelCampo learned from defendant, the children's problems–specifically, night terrors and bed-wetting–would occur for approximately one week before and after visits with plaintiffs. In October 2012, while DelCampo was playing a game with G.R., G.R. "in no uncertain terms expressed a reticence to want to interact with [plaintiffs]."

¶ 51     Based upon his knowledge of the situation, DelCampo opined that "it is traumatic at this point in time for the kids to be consorting with [plaintiffs]." Specifically, given the age of the

children, it is "grossly inappropriate" for them to stay with plaintiffs for a week at a time with no ability to interact with defendant or Tiffany.

¶ 52    Contrary to Osgood's testimony, DelCampo stated that it is "highly improbable" for children between six months and four years of age–roughly the ages of E.R. and G.R. when they lived with plaintiffs–to develop attachments to primary caregivers. Accordingly, DelCampo opined that it would not be harmful for the children to be deprived of visitation with plaintiffs. (We note that during the evidence deposition, DelCampo expressed his understanding that the children had lived with plaintiffs for less than one year.)

¶ 53    On cross-examination, DelCampo acknowledged that (1) he did not observe the children interact with plaintiffs and (2) doing so might have affected his opinion.

¶ 54                           d. David Linares's Testimony

¶ 55    David Linares, a licensed professional clinical counselor from New Mexico, worked as a therapist for children and families at Fort Bliss. Linares testified in January 2013 by means of evidence deposition, the transcript of which the trial court admitted at the November 2013 hearing. At the time of the deposition, Linares had been meeting with G.R. on a weekly basis since July 2012.

¶ 56    Tiffany originally brought G.R. in for counseling because he was suffering from night terrors and bed-wetting, which Tiffany reported would occur shortly after G.R. spoke with plaintiffs. (Defendant attended G.R.'s first therapy session, but none thereafter.) Linares diagnosed G.R. with nightmare disorder. G.R.'s nightmares usually involved plaintiffs "trying to chase him or get him." At a session in late July 2012, G.R. reported that in one of his dreams, the Flash–a comic book hero–"saved him from the Robinsons." Linares noted that G.R. calls plaintiffs "the Robinsons" instead of grandma and grandpa, or some similar title. When Linares asked G.R. why he does this, G.R. stated "that he doesn't like them and he just wants to call them 'the Robinsons.' " G.R. also reported to Linares that plaintiffs tell him that (1) his mother is dead and (2) plaintiffs–not Tiffany and defendant–are his real mother and father. G.R. told Linares that plaintiffs often tell him to "shut up" and "be quiet," which hurts his feelings and makes him angry.

¶ 57    As a treatment goal for G.R., Linares wanted G.R. to express his feelings and explore his "inner world." However, Linares stated that this goal "has been a little bit complicated by his mother, Tiffany, not wanting to reveal to him that she is the stepmother." Linares elaborated, as follows: "[G.R.] has this question that directly crosses his feelings regarding 'why are [plaintiffs] in my life?' And the most that he knows is that they're the grandparents. But he relates grandparents to the Reifs [(defendant's parents)]. So that creates confusion." Early in G.R.'s therapy, Linares "noticed that Tiffany would talk about [plaintiffs] kind of negatively in that she would sigh when talking about them. She didn't smile or have any kind of positive affect toward them." Because children can assimilate those negative attitudes for themselves, Linares encouraged Tiffany and defendant to present a positive attitude when speaking with the children about plaintiffs. Tiffany and defendant reported to Linares they have taken his advice, and it is helping.

¶ 58    Although G.R. has made improvements in his therapy, he still regresses after having contact with plaintiffs. Linares also noted, however, that until approximately one or two months before the January 2013 evidence deposition, G.R. was under the impression that

plaintiffs were trying to gain full custody over him and E.R. G.R. did not understand that the instant court case involved only visitation rights.

¶ 59    In September 2012, Linares decided to make phone contact with plaintiffs, which he explained, as follows:

"I typically don't do mediation, but I thought maybe if I could talk to the grandparents, I could refer them to a mediator with [defendant and Tiffany]. And I spoke to [plaintiffs] on the phone, and they seemed to be very pleasant people. They wanted to meet me. I was agreeable to that. They came down for a visit.

However, between the time that I spoke to them and the time they came down for a visit, [defendant] forbade me from being able to meet with them. He had felt that I had fallen into their trap, so to speak, and I have been taken in by them. And he informed me that after going through such a long court process and spending so much money, that he would want to get this resolved. He did not want to mediate anything."

¶ 60    Contrary to DelCampo's testimony, Linares testified that children the ages of G.R. and E.R. do form attachments to caregivers. Research indicates that attachments take between two months and two years to form. Although Linares opined that G.R. formed an attachment to plaintiffs, Linares concluded that whatever attachment existed was either very poor or altogether broken because G.R. clearly dislikes plaintiffs and does not want to see them. Because contact with plaintiffs "hurts" G.R., Linares recommended that no visitation between plaintiffs and G.R. occur for "at least a period of a few years."

¶ 61    Linares acknowledged that although he has had no direct interaction with E.R., his recommendation would likely be the same for her.

¶ 62    On cross-examination, Linares admitted that if G.R. formed an attachment to plaintiffs, defendant's and Tiffany's negative comments about plaintiffs–if any–could have a "moderate to a very heavy effect on that bond *** because [G.R.] is so young that he can still be indoctrinated for certain beliefs." In any event, regardless of whether G.R.'s attitude toward plaintiffs is justified, or the product of defendant and Tiffany's indoctrination, Linares was certain that G.R. viewed his relationship with plaintiffs in a very negative light.

¶ 63                            3. *The Trial Court's Ruling*

¶ 64    In February 2014, after reviewing the transcripts of the evidence depositions and hearing the parties' arguments, the trial court granted plaintiffs' petition for grandparent visitation. The court found–based upon "common sense" and Osgood's testimony (which the court found credible)–that the children had formed an attachment to plaintiffs during the 18 months that they lived together. Accordingly, plaintiffs had rebutted the presumption that defendant's decision to cut off visitation was not harmful to the children.

¶ 65    In March 2014, the trial court entered a written order, which provided that plaintiffs shall have the following visitation rights as to the children: (1) a weekly, unsupervised phone call; (2) a seven-day visit every June in Decatur; and (3) weekend visits in New Mexico once every April, October, and December.

¶ 66    This appeal followed.

¶ 67                                 II. ANALYSIS

¶ 68    Defendant argues that (1) plaintiffs lacked standing under section 607(a-5)(1) of the Act because defendant did not unreasonably deny visitation; and (2) the trial court's judgment was against the manifest weight of the evidence because plaintiffs failed to rebut the statutory presumption that defendant's actions and decisions regarding grandparent visitation were not harmful to the children's mental, physical, or emotional health. We address defendant's arguments in turn.

¶ 69                    A. Standing Under Section 607(a-5)(1) of the Act

¶ 70    Defendant argues that plaintiffs lack standing under section 607(a-5)(1) of the Act, which provides, in pertinent part, as follows:

> "Except as otherwise provided in this subsection (a-5), any grandparent, great-grandparent, or sibling may file a petition for visitation rights to a minor child if there is an unreasonable denial of visitation by a parent and at least one of the following conditions exists:
>
>                              ***
>
>         (a-5) the child's other parent is deceased or has been missing for at least 3 months." 750 ILCS 5/607(a-5)(1) (West 2010).

Although defendant concedes that the children's other parent (Casey) is deceased, he contends that plaintiffs lack standing because no "unreasonable denial of visitation" existed. Plaintiffs argue that defendant forfeited this standing argument by failing to raise it in a timely manner in the trial court. We agree with plaintiffs.

¶ 71    "Under Illinois law, lack of standing is an affirmative defense, which is the defendant's burden to plead and prove." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 252, 930 N.E.2d 895, 916 (2010). "[A] lack of standing will be forfeited if not raised in a timely manner in the trial court [citations]." *Id.* at 252-53, 930 N.E.2d at 916.

¶ 72    In this case, defendant waited until closing arguments in February 2014–2½ years after plaintiffs filed their petition for grandparent visitation–before arguing that visitation was not unreasonably denied. Even then, defendant did not couch his argument in terms of "standing" (he never uttered the word). Instead, defendant contended that an unreasonable denial of visitation was a "part of the test" for obtaining grandparent visitation, which plaintiffs had failed to prove. By the time of closing arguments in February 2014, the parties had (1) filed multiple pretrial motions, (2) hired expert witnesses, (3) conducted two evidence depositions, and (4) engaged in a full evidentiary hearing. Even if defendant's closing argument could be construed as raising an objection to plaintiffs' standing, that objection was clearly untimely. Accordingly, defendant has forfeited his objection to plaintiffs' standing under section 607(a-5)(1) of the Act. (We note that defendant declined to file a reply brief responding to plaintiffs' forfeiture argument.)

¶ 73    We also note that even if defendant had preserved his objection under section 607(a-5)(1) of the Act, the record contains sufficient evidence to support a finding that defendant unreasonably denied visitation. Although both parties could have approached the situation more diplomatically, defendant terminated all visitation after plaintiffs had spent the past 18 months taking on full parenting responsibilities for defendant's children, even after defendant had returned to health. Given Casey's death, as well as the intimate relationship that must have

existed between the children and plaintiffs for 18 months, the court could have concluded that it was unreasonable for defendant to completely cut ties with plaintiffs immediately upon obtaining custody of the children.

¶ 74                    B. Visitation Under Section 607(a-5)(4) of the Act

¶ 75    Defendant next argues that the trial court's judgment was against the manifest weight of the evidence. Specifically, defendant contends that plaintiffs failed to rebut the statutory presumption that defendant's actions and decisions regarding grandparent visitation were not harmful to the children's mental, physical, or emotional health. That presumption is contained in section 607(a-5)(3) of the Act, which provides as follows:

> "In making a determination under this subsection (a-5), there is a rebuttable presumption that a fit parent's actions and decisions regarding grandparent, great-grandparent, or sibling visitation are not harmful to the child's mental, physical, or emotional health. The burden is on the party filing a petition under this Section to prove that the parent's actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health." 750 ILCS 5/607(a-5)(3) (West 2010).

¶ 76    This statutory presumption reflects the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 68 (2000), which recognized "a presumption that fit parents act in the best interests of their children." That presumption derives from the due process clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV), which "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66; see *Flynn v. Henkel*, 227 Ill. 2d 176, 181, 880 N.E.2d 166, 169 (2007).

¶ 77    In *Troxel*, the Supreme Court struck down a Washington state statute that allowed any person to seek court-ordered visitation with a child if visitation would "serve the best interest of the child." (Internal quotation marks omitted.) *Troxel*, 530 U.S. at 67. The Supreme Court held that the Washington statute contravened the presumption that a fit parent makes decisions in the best interest of the child because it placed the best interest determination solely in the hands of a judge, without affording any special weight to the parent's determination. *Id*. In so holding, the *Troxel* Court further noted that the grandparents in that case never alleged that the fit parent altogether denied visitation. *Id*. at 71. The Court cited visitation statutes from other states requiring a showing that the parent had denied visitation (or unreasonably denied visitation) to the concerned third party. *Id*. at 70.

¶ 78    In the wake of *Troxel*, the Illinois Supreme Court struck down section 607(b)(1) of the Act–this state's former grandparent visitation statute–because, like the Washington statute at issue in *Troxel*, it "expose[d] the decision of a fit parent to the unfettered value judgment of a judge and the intrusive micromanaging of the state." *Wickham v. Byrne*, 199 Ill. 2d 309, 320, 769 N.E.2d 1, 8 (2002). In response to *Wickham*, the General Assembly passed Public Act 93-911 (eff. Jan. 1, 2005), which amended section 607 of the Act to reflect the constitutional requirements set forth in *Troxel* and *Wickham*. Specifically, Public Act 93-911 added (1) the statutory presumption that a fit parent's decisions regarding visitation are not harmful to the child (750 ILCS 5/607(a-5)(3) (West 2010)), (2) the requirement that the concerned third party be unreasonably denied visitation before filing a petition (750 ILCS 5/670(a-5)(1) (West

2010)), and (3) the following list of factors that the trial court "shall consider" in determining whether to grant visitation:

"(A) the preference of the child if the child is determined to be of sufficient maturity to express a preference;

(B) the mental and physical health of the child;

(C) the mental and physical health of the grandparent, great-grandparent, or sibling;

(D) the length and quality of the prior relationship between the child and the grandparent, great-grandparent, or sibling;

(E) the good faith of the party in filing the petition;

(F) the good faith of the person denying visitation;

(G) the quantity of the visitation time requested and the potential adverse impact that visitation would have on the child's customary activities;

(H) whether the child resided with the petitioner for at least 6 consecutive months with or without the current custodian present;

(I) whether the petitioner had frequent or regular contact or visitation with the child for at least 12 consecutive months;

(J) any other fact that establishes that the loss of the relationship between the petitioner and the child is likely to harm the child's mental, physical, or emotional health; and

(K) whether the grandparent, great-grandparent, or sibling was a primary caretaker of the child for a period of not less than 6 consecutive months." 750 ILCS 5/607(a-5)(4) (West 2010).

With the pertinent provisions and the constitutional underpinnings of the grandparent visitation statute in mind, we now turn to the trial court's judgment in this case.

¶ 79                                     1. *Standard of Review*

¶ 80    The supreme court has explained the standard of review applicable to the trial court's judgment under section 607(a-5) of the Act, as follows:

"Section 607(a-5)(3) [of the Act] places the burden on the party filing the visitation petition to prove that the parent's actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health. A trial court's determination that a fit parent's decision regarding whether grandparent visitation is or is not harmful to the child's mental, physical, or emotional health will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Flynn*, 227 Ill. 2d at 181, 880 N.E.2d at 169.

"A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350, 860 N.E.2d 240, 245 (2006).

¶ 81                        2. *The Evidence Presented and the Statutory Factors*

¶ 82    Initially, we note that plaintiffs' evidence and defendant's evidence painted two drastically different pictures of the children's relationship with plaintiffs. If plaintiffs' witnesses are to be believed, the children greatly enjoy being with their loving, nurturing grandparents. On the

other hand, if defendant's witnesses are to be believed, plaintiffs are so nasty to the children that G.R. has nightmares just from talking to them on the phone. The trial court heard live testimony from defendant, Tiffany, both plaintiffs, and two witnesses who observed the children interact with plaintiffs. The court read the evidence-deposition transcripts of both of defendant's expert witnesses, and it heard the live testimony of plaintiffs' expert witness. When presented with a record such as this, we are mindful that "[b]ecause the trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight to be given to the witnesses' testimony." *In re Stephen K.*, 373 Ill. App. 3d 7, 20, 867 N.E.2d 81, 94 (2007).

¶ 83    Defendant relies upon the supreme court's decision in *Flynn*, which reversed the trial and appellate courts, concluding that the grandmother in that case failed to rebut the presumption that the fit mother's denial of visitation was not harmful to the child. Specifically, defendant cites the following passage from *Flynn*:

> "Neither denial of an opportunity for grandparent visitation, *** nor a child 'never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother,' *** is 'harm' that will rebut the presumption stated in section 607(a-5)(3) [of the Act] that a fit parent's denial of a grandparent's visitation is not harmful to the child's mental, physical, or emotional health." *Flynn*, 227 Ill. 2d at 184, 880 N.E.2d at 171.

¶ 84    In *Flynn*, however, "the trial court did not make any specific findings as to how [the grandmother] had overcome the statutory presumption that [the mother's] decisions regarding grandparent visitation were not harmful to [the child's] mental, physical, or emotional health." *Id*. at 180, 880 N.E.2d at 168. This is a critical distinction between *Flynn* and the facts of the case before us. In *Flynn*, the trial court made the following general statement at the close of evidence and arguments:

> " 'Based on the testimony presented[,] the Court finds that the petitioner has met her burden. The harm in this case is not something that you can put in the sense of a direct emotional harm. It's a direct denial of an opportunity that every grandparent according to this statute is entitled to.' " *Id.* at 179, 880 N.E.2d at 168.

The Second District appellate court affirmed the trial court's judgment in *Flynn*, holding as follows:

> "The harm that [the child] would suffer if there were no visitation can be inferred from the evidence. As the trial court stated, it 'is not something that you can put in the sense of a direct emotional harm.' However, [the grandmother's] love for [the child] is manifest in the record. *** If [the grandmother] were denied visitation, [the child] would be harmed by never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother." *Flynn v. Henkel*, 369 Ill. App. 3d 328, 335, 859 N.E.2d 1063, 1068 (2006), *rev'd*, 227 Ill. 2d 176, 880 N.E.2d 166 (2007).

¶ 85    Rejecting this reasoning, the supreme court in *Flynn* noted that the grandmother "did not present any evidence to show that denial of visitation with her would result in harm to [the child's] mental, physical, or emotional health. The only evidence pertaining to harm [the child] would experience from the denial of visitation with his grandmother came from [the mother], who was asked, 'Do you believe it would be harmful for [the child] not to see [the

grandmother] and visit with her?' and she answered, 'No.' " *Flynn*, 227 Ill. 2d at 184, 880 N.E.2d at 170.

¶ 86     In this case, however, plaintiffs presented expert testimony from Osgood, who explained the psychological community's consensus that young children develop attachments to primary caregivers. Because E.R. and G.R. spent 18 months with plaintiffs during a "critical development stage," Osgood opined that the children formed an attachment to plaintiffs. Osgood based this opinion, in part, on her clinical interviews with plaintiffs and her review of photos and videos of the children interacting with plaintiffs. Given the existence of this caregiver attachment, Osgood concluded that depriving the children of all visitation with plaintiffs would cause a major disruption in their lives that would be damaging emotionally.

¶ 87     Osgood further described how terminating the children's relationship with plaintiffs could lead to reactive attachment disorder, which could cause them difficulty in establishing and maintaining new healthy relationships in the future. The trial court, noting that Osgood's testimony was credible, specifically found that (1) the children had formed a bond with plaintiffs and (2) it would be harmful to the children if their relationship with plaintiffs ceased to exist.

¶ 88     Defendant argues that the trial court should have based its ruling on the testimony of his experts, who actually met the children. However, although plaintiff's expert, Osgood, may have been better informed if she had met the children, we believe (and the trial court could have concluded) that defendant's experts may have been better informed if they had met plaintiffs. Indeed, all of the three experts acknowledged to some degree that their opinions were based on limited information because they did not have an opportunity to observe all the relevant parties interacting together. This case presents a classic example of a "battle of the experts." The experts, all qualified in their respective fields, gave differing statements of fact and opinion regarding whether the children would be harmed if they were deprived of visitation with plaintiffs. As the supreme court has warned, "a 'battle of the experts' is a situation in which reviewing courts are especially loathe to second-guess the findings made by the trier of fact." *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 216, 835 N.E.2d 801, 870 (2005).

¶ 89     In his brief to this court, defendant further asserts–as if it were an undisputed fact–that plaintiffs caused G.R. to suffer from nightmares and bed-wetting. However, DelCampo and Linares both admitted that most of their knowledge about G.R.'s reactions to plaintiffs was based upon the reports of defendant and Tiffany. In other words, neither DelCampo nor Linares had personal knowledge that G.R.'s nightmares and bed-wetting corresponded in time with visits or phone calls from plaintiffs. Yet DelCampo and Linares based their ultimate conclusions, in part, on the assumption that defendant and Tiffany were accurately reporting the timing and severity of G.R.'s nighttime problems. At the hearing, the trial court was able to judge the credibility of defendant and Tiffany's claims regarding G.R.'s nightmares and bed-wetting. Although the court did not address whether it found defendant or Tiffany credible, our standard of review counsels against our blindly accepting defendant and Tiffany's assertions as true, especially when those assertions may be inconsistent with the trial court's ultimate decision.

¶ 90     Assuming G.R.'s nighttime problems did actually correspond in time with visits and phone calls from plaintiffs, the trial court could have reasonably concluded that plaintiffs were not the primary cause of those problems. By all accounts, the children were happy and healthy during

the 18 months they lived with plaintiffs. It was not until defendant regained custody of the children and visits with plaintiffs became contentious that G.R. began suffering from nightmares and bed-wetting. Osgood stated that "messages by [defendant and Tiffany] probably have a lot to do with [G.R.] having nightmares." Linares acknowledged the possibility that indoctrination by defendant and Tiffany contributed to G.R.'s negative feelings toward plaintiffs. Notably, Linares described his only interaction with plaintiffs (his September 2012 phone call to Linette) as follows:

> "It was a pleasant conversation. The grandmother informed me that the things that [G.R.] was saying just weren't true, that things might be misconstrued or thoughts put into his head by [defendant and Tiffany]. She informed me she was working a second job to pay for her lawyer. And I thought that was very, very sweet. She was very pleasant. We had a good conversation overall. And I informed them how the dynamic, how this might be hurting [G.R.]"

¶ 91 In this case, the trial court heard evidence that defendant and Tiffany said and did things which caused the children to view plaintiffs in a negative light. When defendant and Tiffany took Linares's advice that they present a positive attitude of plaintiffs to the children, things changed for the better. This suggests that defendant and Tiffany's actions and decisions–not just those of the plaintiffs–were partially to blame for the mental and emotional harm to the children.

¶ 92 The trial court had an opportunity to observe both parents and grandparents in person, study their demeanor, and listen to their testimony. The court was in a better position than Linares or DelCampo (or this court, for that matter) to judge whether defendant's actions and decisions regarding visitation were harmful to the children. Implicit in the court's judgment is the finding that whatever harm might come to the children from regular visitation with plaintiffs is overcome by the harm that would result from terminating the unique grandparent-grandchild relationship at issue in this case.

¶ 93 The evidence presented, although conflicting in many important respects, clearly established that plaintiffs raised the children, as if their own, for 18 months following Casey's tragic death and defendant's hospitalization. Plaintiffs' reluctance to give up the children, coupled with the ensuing court battle to retain custody, understandably soured defendant's relationship with plaintiffs. Perhaps unintentionally, the negativity between defendant and plaintiffs was impressed upon the children, who were undoubtedly overwhelmed and confused as to the true makeup of their family. The bad blood between plaintiffs and defendant affected the children's mental and emotional health. The parties blame each other for this. Although a father's actions and decisions concerning the care, custody, and control of his children are presumptively valid, defendant's actions and decisions in this case were animated by factors other than the children's best interests. Although both parties might have good reasons for resenting each other, section 607(a-5) of the Act focuses on the harm to the children.

¶ 94 The trial court in this case found that plaintiffs met their burden of demonstrating that defendant's "actions and decisions regarding visitation times are harmful to the child[ren]'s mental, physical, or emotional health" (750 ILCS 5/607(a-5)(3) (West 2010)). The court found that the children had formed an attachment to plaintiffs, which, if broken, would cause the children emotional harm. Based upon our thorough review of the record, we conclude that the court's judgment was not against the manifest weight of the evidence.

¶ 95                              III. CONCLUSION

¶ 96          For the reasons stated, we affirm the trial court's judgment.

¶ 97          Affirmed.